David B. Goroff (DG 1374)
Derek L. Wright (DW 6337)
FOLEY & LARDNER
321 N. Clark Street, Suite 2800
Chicago, IL  60610
Telephone: (312) 832-4500
Facsimile: (312) 832-4700

-and-

Todd C. Norbitz (TN 5747)
FOLEY & LARDNER
90 Park Avenue, 37th Floor
New York, NY 10016-1314
Tel: (212) 682-7474
Fax: (212) 687-2329

Attorneys for Plaintiff-Counterclaim-Defendant Capp Seville, Inc.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **In re:** | x<br>: | **Chapter 11** |
| **NORTHWEST AIRLINES CORPORATION, et al.,** | :<br>: | **Case No. 05-17930 (ALG)** |
| **Debtors.** | :<br>: | **Jointly Administered** |
| ------------------------------------------------ | : | |
| **CAPP SEVILLE, INC.,** | :<br>: | |
| **Plaintiff-Counterclaim-Defendant** | :<br>:<br>: | **Adv. Pro. No. 06-01446** |
| **v.** | :<br>: | |
| **NORTHWEST AIRLINES, INC.,** | :<br>: | |
| **Defendant-Counterclaim-Plaintiff** | :<br>: | |
| ------------------------------------------------ | : | |
| **NORTHWEST AIRLINES INC.,** | :<br>: | |
| **Third Party Plaintiff,** | :<br>: | |
| **v.** | :<br>: | |
| **LARKEN, INC.,** | :<br>: | |
| **Third Party Defendant** | x | |

**DESIGNATION OF ADDITIONAL ITEMS
TO BE INCLUDED IN RECORD ON APPEAL**

Pursuant to Bankruptcy Rule 8006, Appellee Capp Seville, Inc. ("Capp") hereby

submits its designation of additional items to be included in the record on appeal of the

Bankruptcy Court's April 11, 2008 Order denying Northwest Airlines, Inc.'s ("Northwest")

Motion for Summary Judgment on the Issue of Plaintiff Capp Seville, Inc.'s Liability for Breach

of Contract and Granting Capp's Cross-Motion for Summary Judgment as to All Issues Raised

Against it by Northwest in its Counterclaim.

**DESIGNATION OF ADDITIONAL ITEMS TO BE
INCLUDED IN RECORD ON APPEAL**

1.    Transcript from the October 30, 2007 hearing on Northwest's Motion for

Summary Judgment on the Issue of Plaintiff Capp Seville, Inc.'s Liability for Breach of Contract

and Capp's Cross-Motion for Summary Judgment as to All Issues Raised Against It by

Northwest in Its Counterclaim.  This transcript was previously requested and a certified copy is

attached hereto as Exhibit A.

Dated:  May 9, 2008

/s/ *David B. Goroff*
David B. Goroff (DG 1374)
Derek L. Wright (DW 6337)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL  60610
Telephone:  (312) 832-4500
Facsimile:  (312) 832-4700
-and-
Todd C. Norbitz (TN 5747)
FOLEY & LARDNER LLP
90 Park Avenue, 37th Floor
New York, NY  10016-1314
Telephone:  (212) 682-7474
Facsimile:  (212) 687-2329

Attorneys for Plaintiff-Counterclaim-Defendant
Capp Seville, Inc.

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that on May 9, 2008, he caused a true and correct copy of the DESIGNATION OF ADDITIONAL ITEMS TO BE INCLUDED IN RECORD ON APPEAL to be served via U.S. mail, on the following individuals:

Jeffrey A. Eyres
Brian W. Thomson
Leonard Street and Deinard
150 South Fifth Street, Suite 2300
Minneapolis, Minnesota 55402
jeff.eyres@leonard.com
brian.thomson@leonard.com

Dale E. Barney
Gibbons, Del Deo, Dolan, Griffinger & Vecchione PC
One Pennsylvania Plaza, 37th Floor
New York, New York 10119-3701
dbarney@gibbonslaw.com

Paula L. Roby
Elderkin and Pirnie, P.L.C.
115 First Avenue S.E.
Cedar Rapids, Iowa 52401
plroby@elderkinpirnie.com

Gregory M. Petrick
Cadwalader Wickersham & Taft LLP
One World Financial Center
New York, NY 10281
gregory.petrick@cwt.com

Dated: May 9, 2008

FOLEY & LARDNER LLP

By: /s/ *David B. Goroff*
    David B. Goroff (DG 1374)
    Derek L. Wright (DW 6337)
    321 N. Clark Street, Suite 2800
    Chicago, IL 60610
    Tel: (312) 832-4500
    Fax: (312) 832-4700

    Todd C. Norbitz (TN 5747)
    90 Park Avenue, 37th Floor
    New York, NY 10016-1314
    Tel: (212) 682-7474
    Fax: (212) 687-2329

    Attorneys for Plaintiff-Counterclaim-Defendant
    Capp Seville, Inc.

CHIC_2910336.1

# EXHIBIT A

1                    UNITED STATES BANKRUPTCY COURT
                     SOUTHERN DISTRICT OF NEW YORK
2
                                       .  Chapter 11
3                                      .
                                       .  Case No. 05-17930 (ALG)
4    IN RE:                            .
                                       .  (Jointly Administered)
5    NORTHWEST AIRLINES                .
     CORPORATION, et al,               .  New York, New York
6                                      .  Tuesday, October 30, 2007
                                       .  9:08 a.m.
7         Reorganized Debtors.         .
     . . . . . . . . . . . . . . . .   .
8    CAPP SEVILLE, INC.,               .
                                       .  Adv. Proc. 06-01446 (ALG)
9              vs.                     .
                                       .
10   NORTHWEST AIRLINES, INC.          .
     . . . . . . . . . . . . . . . .   .
11
         TRANSCRIPT OF REORGANIZED DEBTORS' TIER III(B) OBJECTION
12          DEBTORS' TWENTY-FIFTH OMNIBUS (TIER II) OBJECTION
           MOTION FOR SUMMARY JUDGMENT IN ADVERSARY PROCEEDING
13              BEFORE THE HONORABLE ALLAN L. GROPPER
                    UNITED STATES BANKRUPTCY JUDGE
14
     APPEARANCES:
15
     For the Debtors:            J. David Leamon, Esq.
16                               CADWALADER, WICKERSHAM & TAFT, LLP
                                 One World Financial Center
17                               New York, New York 10281
18

19   (Appearances continued)

20   Audio Operator:             Electronically Recorded
                                 by Stacey Hibbert, ECRO
21
     Transcription Company:      Rand Reporting & Transcription, LLC
22                               80 Broad Street, Fifth Floor
                                 New York, New York 10004
23                               (212) 504-2919
                                 www.randreporting.com
24
     Proceedings recorded by electronic sound recording, transcript
25   produced by transcription service.

```
1   APPEARANCES:   (Continued)

2   For the Debtors:              Jeffrey A. Eyers, Esq.
                                  Brian W. Thompson, Esq.
3                                 LEONARD, STREET & DEINARD, PA
                                  150 South Fifth Street, Suite 2300
4                                 Minneapolis, Minnesota 55402

5   For the Post-Effective
    Date Committee:               Jordan A. Wishnew, Esq.
6                                 OTTERBOURG, STEINDLER, HOUSTON
                                    & ROSEN, P.C.
7                                 250 Park Avenue
                                  New York, New York 10169
8
    For Penta Aviation:           Thomas G. Macauley, Esq.
9                                 ZUCKERMAN SPAEDER, LLP
                                  919 Market Street, Suite 990
10                                Wilmington, Delaware 19899

11  For Capp Seville, Inc.:       David B. Goroff, Esq.
                                  FOLEY & LARDNER, LLP
12                                321 North Clark Street, Suite 2800
                                  Chicago, Illinois 60610
13
                                  Dana C. Rundlof, Esq.
14                                FOLEY & LARDNER, LLP
                                  90 Park Avenue
15                                New York, New York 10016

16                                Daniel W. Boerigter, Esq.
                                  YOST & BAILL, LLP
17                                Suite 2050, 220 South Sixth Street
                                  Minneapolis, Minnesota 55402
18  For the John Hancock
    Entities and Wells Fargo
19  as Indenture Trustee:         David S. Cohen, Esq.
                                  MILBANK, TWEED, HADLEY
20                                  & MC CLOY, LLP
                                  International Square Building
21                                1850 K Street, NW
                                  Washington, D.C. 20006
22  For Wilmington Trust
    Company as Owner Trustee:     Stephen M. Miller, Esq.
23  (Via Telephone)               MORRIS JAMES, LLP
                                  500 Delaware Avenue, Suite 1500
24                                Wilmington, Delaware 19899

25  Pro Se Claimant:              Sam Griffiths.
```

1                                    INDEX

2                                                              Page

3    ADJOURNED MATTERS                                           6

4
     REORGANIZED DEBTORS' TIER III(B) OBJECTION TO PROOFS        9
5    OF CLAIM NOS. 9604 AND 12405 FILED BY SAM GRIFFITHS

6    DEBTORS' TWENTY-FIFTH OMNIBUS (TIER II) OBJECTION          21
     RE:  WILMINGTON TRUST COMPANY
7

8    IN RE:  CAPP SEVILLE V. NORTHWEST AIRLINES                 36
     MOTIONS FOR SUMMARY JUDGMENT
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Proceedings commence at 11:53 a.m.)

2          THE COURT:  We need to get some people on the phone.

3      (Court and court personnel confer.)

4          THE COURT:  Anyone who has not given their card or

5  their appearance to the reporter, who is going to speak, is

6  asked to please do so.

7      (Conference call established.)

8          THE CLERK:  This is Judge Gropper's courtroom.

9          THE COURT:  Good afternoon.  This is Judge Gropper.

10  I'll take appearances from those in the courtroom first, and

11  then from those on the telephone.

12          From the court.

13      MR. LEAMON:  Good morning, Your Honor.  David Leamon,

14  Cadwalader, Wickersham & Taft, for the debtors and reorganized

15  debtors Northwest Airlines, Inc.

16          THE COURT:  I stand corrected.  All right.  Who else

17  for the debtors?

18      MR. EYRES:  Good morning, Your Honor.  Jeff Eyres,

19  Leonard, Street & Deinard appearing on behalf of the debtor

20  Northwest Airlines with respect to the Capp Seville matter.

21      MR. GOROFF:  Good morning, Your Honor.  David Goroff,

22  Foley & Lardner, on behalf of Capp Seville.

23      MR. WISHNEW:  Good morning, Your Honor.  Jordan

24  Wishnew, Otterbourg, Steindler, Houston & Rosen, for the Post-

25  Effective Date Committee.

1          THE COURT:  Anyone else appearing?  Mr. Griffiths.

2   Are you Mr. Griffiths?

3          MR. GRIFFITHS:  Here.

4          THE COURT:  All right.  Just state your name.

5          MR. GRIFFITHS:  Sam Griffiths, claimant.

6          THE COURT:  You're a claimant individually?

7          MR. GRIFFITHS:  Yes.

8          THE COURT:  And you don't have a lawyer.

9          MR. GRIFFITHS:  No.

10          THE COURT:  Is that right?  All right.  I tried to

11   reach you by telephone to say that you didn't have to come all

12   the way to New York, but you're here, and if you just sit down

13   --

14          MR. GRIFFITHS:  All right.

15          THE COURT:  -- we'll take certain uncontested -- no,

16   stay up front; you can stay at the desk or at the chair right

17   behind you -- we'll take certain uncontested matters first,

18   then we'll take your matter, Mr. Griffiths.

19          Yes.

20          MR. COHEN:  Good morning, Your Honor.  David Cohen,

21   Milbank, Tweed, Hadley & McCloy, here on behalf of the John

22   Hancock entities, and Wells Fargo as Indenture Trustee, on the

23   twenty-fifth omnibus objection.

24          THE COURT:  All right.

25          MR. MACAULEY:  Good morning, Your Honor.  Thomas

1  Macauley on behalf of Penta Aviation on that same matter.

2      THE COURT:  All right.  Anyone else in the courtroom?

3    (No verbal response.)

4      THE COURT:  All right.  On the telephone, please.  Is

5  somebody on the phone?

6      MR. MILLER:  Good morning, Your Honor.  Good morning,

7  Your Honor.  Stephen Miller of Morris James, LLP, on behalf of

8  Wilmington Trust Company as Owner Trustee.

9      THE COURT:  Anyone else on the phone, individual or

10  lawyer?

11      MR. HOROWITZ:  Leonard Horowitz with Capp Seville in

12  Minneapolis.

13      THE COURT:  All right.  Anyone else?

14    (No verbal response.)

15      THE COURT:  Very good.  Let's proceed.

16      MR. LEAMON:  Good afternoon, Your Honor.  David

17  Leamon, Cadwalader, Wickersham & Taft, for Northwest.

18      There are no uncontested matters on the agenda for

19  today, although there are a few adjourned matters, if you want

20  me to --

21      THE COURT:  All right.  Why don't you state what's

22  being adjourned.

23      MR. LEAMON:  Yes, Your Honor.

24      The first adjourned matter is the debtors' twenty-

25  fifth omnibus Tier II objection, solely as it relates to three

1    proofs of claim filed by the City of Los Angeles, Claim Nos.

2    979, 6307, and 12364.  That matter is being adjourned until

3    November 14th, 2007, at 11 a.m.

4          The second matter is the notice -- I'm sorry -- the

5    adjournment of the application of Federal Express Corporation

6    for an administrative expense priority claim.  That is being --

7    the debtors have until early May of next year, Your Honor, to

8    object to administrative expense claims, so this is going to be

9    tabled until the debtors continue to review the claim and

10   decide how they want to proceed with that.

11         THE COURT:  How many administrative expense claims are

12   up in the air?

13         MR. LEAMON:  Your Honor, it's a small number; I would

14   say probably less than about eight or ten that I'm aware of

15   that we're currently actively reviewing.

16         THE COURT:  I think the debtors would be ill-advised

17   to take all of that time to resolve these claims, so maybe the

18   next time you can give me a report.

19         MR. LEAMON:  Yes, Your Honor.

20         THE COURT:  Because very often plans have very lengthy

21   times for these things to be objected to; and while that may be

22   a safety valve, it may not be fair to push these off quite that

23   far.

24         MR. LEAMON:  Yes, Your Honor, we will --

25         THE COURT:  But that's for another day.

1          MR. LEAMON:  Yes, Your Honor.  We'll provide that to

2  you at the next hearing, which is scheduled for November 9th at

3  11 a.m.

4          THE COURT:  Okay.

5          MR. LEAMON:  Your Honor, that does it for the

6  adjourned matters.

7          THE COURT:  All right.

8          MR. LEAMON:  We've got -- for contested matters, we

9  have the reorganized debtors' Tier III objection to Mr. Sam

10  Griffiths -- two claims filed by Mr. Griffiths, a pre-petition

11  and an administrative expense claim, for a claim that is

12  asserting post-petition amounts.

13          THE COURT:  All right.

14          MR. LEAMON:  We also have, continued from the

15  previously hearing, Your Honor, I believe on September 25th,

16  the debtors' twenty-fifth omnibus objection with respect to

17  Claim No. 7237, the Wilmington Trust/Penta matter.  That will

18  be going forward.

19          And then we have the motion of Josue Payes, Royal

20  Airline Linen of New York, for relief from the stay.  That

21  hearing will go forward, Your Honor.

22          And we also have, of course, the adversary proceeding;

23  the Capp Seville adversary, which will be going forward with

24  respect to the two cross-motions for summary judgment.

25          THE COURT:  All right.  Where shall we start; shall we

1    start with Mr. Griffiths' claim?

2              MR. LEAMON:  Yes, Your Honor.

3              Your Honor, as you know, this is a Tier III objection.

4    The two proofs of claim filed by Mr. Sam Griffiths; Claim No.

5    9604, pursuant to approximately $2.1 million relating to

6    certain discrimination claims that he had filed in state court

7    and were removed to federal court back in 1999, 2000.  His

8    claims were dismissed based on Northwest's motion to have those

9    claims arbitrated.  It's Northwest's position that Mr.

10   Griffiths, thereafter, effectively sat on his rights and did

11   not pursue those claims.

12             We object to that claim, 9604, Your Honor, on two

13   grounds:

14             The first being that when the claims were filed in

15   state court, the claims arising out of Minnesota state law were

16   time-barred when filed.  The Minnesota statute requires that

17   Mr. Griffiths had filed his claims in a court of law within

18   forty-five days of having received a notice, right-to-sue

19   letter from the Minnesota Department of Human Rights.  Mr.

20   Griffiths waited approximately, I believe 137 days, Your Honor,

21   to file that to commence that action.

22             With respect to the Title VII federal discrimination

23   claims, Your Honor, the lawsuit filed by Mr. Griffiths was

24   filed on approximately the eighty-ninth day of the ninety-day

25   statute of limitations.  However, under the cases that we cite

1  in the objection, the statute of limitations was not tolled

2  during the pendency of that case; and that, upon dismissal, the

3  claims were either, at that time, time-barred, or certainly --

4  and even if you reset the statute for a full ninety days, it

5  became time-barred as a result of Mr. Griffiths' inaction.

6          Therefore, we're asking the Court to disallow those

7  claims, first on the grounds that they are time-barred; and

8  second on the doctrine of laches, based on the inordinate and

9  inexcusable delay of Mr. Griffiths to prosecute these claims --

10          THE COURT:  Now the decision of Judge Magnuson of the

11  U.S. District Court, dated March 31, 2000, is attached to your

12  papers.

13          MR. LEAMON:  Yes, Your Honor.

14          THE COURT:  That says:

15          "The defendant's motion to compel arbitration and to

16          stay or dismiss is granted, and the case is dismissed

17          without prejudice.

18          MR. LEAMON:  Yes, Your Honor.

19          THE COURT:  [quoting] ...

20          "Any further prosecution of the claims in plaintiff's

21          complaint must be pursued through binding

22          arbitration."

23          MR. LEAMON:  Yes, Your Honor.

24          THE COURT:  All right.  So I know you're making the

25  argument that arbitration has been, in effect, forfeited

1    because of laches.  But why isn't that a question for the

2    arbitrator?

3         MR. LEAMON:  Your Honor, it's Northwest's position

4    that Your Honor has jurisdiction to decide these claims, and

5    that, while an arbitrator certainly could do so, there is no

6    controlling authority that mandates that an arbitrator make

7    that decision.

8         THE COURT:  Well, there's lots of authority -- it's

9    growing -- that if a matter is either core or non-core, except

10   in extreme circumstances such as the U.S. Lines case,

11   arbitration should be respected in bankruptcy proceedings and

12   shouldn't be interfered with.  And you certainly can't argue

13   that this is an extreme case; this is one claimant out of many

14   thousands.

15        MR. LEAMON:  Yes, Your Honor, you're correct.

16   However, I would think that, when taken holistically, that

17   arbitration would prejudice Northwest even more.  The Court --

18        THE COURT:  Sounds to me like that's an argument that

19   might win before the arbitrator, or might not; but it sounds to

20   me like that's a good argument for the arbitrator, but that I'm

21   not necessarily the right person to decide it.

22        MR. LEAMON:  Yes, Your Honor.  We're aware of the

23   authority that Your Honor cites.  And you know, our only

24   position would be that, to the extent that Your Honor does have

25   jurisdiction, we would ask that the Court exercise that

1    jurisdiction.

2         THE COURT:  Has there been, to your knowledge, any

3    development on the law that would call mister -- excuse me --

4    Judge Magnuson's decision sending this to arbitration into

5    question?

6         MR. LEAMON:  Not per se, Your Honor, just that the

7    circumstances under which that decision was rendered was

8    certainly outside of bankruptcy, that there --

9         THE COURT:  That was years ago.

10        MR. LEAMON:  It was years ago, Your Honor.  And that,

11   as waning as it might be, that there does still exist some

12   authority under which this Court would be justified in

13   exercising -- retaining jurisdiction and exercising that

14   jurisdiction to resolve these claims.  Certainly it's at Your

15   Honor's discretion, but that would be what the debtors would

16   request.

17        THE COURT:  Well, the claim has to be resolved.  I

18   mean, there is a claim.  Debtor is in bankruptcy.  You want to

19   get out of bankruptcy.  Although you've already mentioned a May

20   date, hopefully we'll get all of the claims resolved sooner,

21   rather than later.  So there has to be some deadline here --

22        MR. LEAMON:  Yes, Your Honor.

23        THE COURT:  -- so that you don't have to reserve for

24   this claim forever.

25        MR. LEAMON:  Absolutely, Your Honor.  And we would ask

1   that that day be today, and the --

2         THE COURT:  Well, I understand that.  All right.

3   Thank you.

4         MR. LEAMON:  Yes, Your Honor.  Thank you.

5         THE COURT:  Mr. Griffiths.  I've read your papers, and

6   I understand your position.

7         MR. GRIFFITHS:  Thank you, Your Honor.

8         THE COURT:  And what I've suggested to the debtor is

9   the following:

10        That your claims for damages against the debtors were

11  incorporated in a lawsuit which was before Judge Magnuson in

12  2000, and he dismissed them on the ground that you should go to

13  arbitration.

14        MR. GRIFFITHS:  Yes.

15        THE COURT:  And I have two questions; one is:

16        All right.  The arbitration remedy, if it's still

17  there, is what Judge Magnuson said should be done, and I don't

18  necessarily have jurisdiction to review what he did.

19        Secondly, they will argue before the arbitrator that

20  you waited too long, and that the whole thing is stale, and

21  they've been damaged.  But that's a question for the

22  arbitrator.

23        And the third question that we'll come to, but you

24  don't have to handle them all at once, is whether there

25  shouldn't be some deadline because we do have a bankruptcy

14

1    here, they have a bunch of claims.  Until they resolve your

2    claim, they have to reserve for it, so you get your

3    distribution of stock the same as every other creditors.

4            MR. GRIFFITHS:  Yes, Your Honor.

5            I believe that I have been diligent in approaching

6    this, my termination; that is, I started out by first hiring a

7    lawyer to work with Northwest to resolve the situation, then

8    following up with the Minnesota Department of Human Rights,

9    then following up with the EEOC, and then filing a lawsuit; so

10   that I think that shows diligence during that time period.

11           There is also a question of diligence after that time

12   period.  And though I showed one document that showed that

13   there has been communication -- or there had been communication

14   between Eric Nelson of the firm that represented Northwest at

15   the time, there had been several communications on there.

16           I would also point out that the EEOC and the Minnesota

17   Department of Human Rights were very clear in the deadlines for

18   filing lawsuits:  Forty-five days for the Minnesota Department

19   of Human right; ninety days for the EEOC.  Northwest never

20   shared with its employees in any documentation that I have that

21   there is a ninety-day limitation.  The question of ninety-day

22   limitation came up much later in the process.  It would seem

23   like the company would have a fiduciary responsibility to share

24   that information and not hide it, or not give it to the

25   prospective arbitrees.

1           As I -- and so those items says that I have been

2    diligent, and it also says that -- I have documentation to show

3    that I have made communications back in 2002 -- I'm sorry, in

4    2000 and after.  I have envelopes that kept coming back because

5    they were no longer looking at -- I assume they were no longer

6    looking at my arbitration, so those mail came back unopened.

7    So I have been diligent, and I do have actually mail back there

8    that I could share, that I haven't presented previously.  So

9    for those things, I have been diligent.

10          And I believe that, one, with the record that I have

11   in Northwest, the record is that I -- as an employee, I was an

12   excellent employee per their own documentation.  The things

13   that I did above and beyond my work were exceptional; they

14   added value to the company, millions of dollars.

15          You know, and looking at that growth, I also look at

16   the person I thought instigated the problem, Andy Roberts, who

17   has moved up very fast.  In fact, he has been awarded $10

18   million in stock, as to keep individuals like that at the

19   company.   In my Minnesota Department of Human Rights, you can

20   see Andy Roberts' name mentioned several times because, until

21   Andy showed up, everything was flowing fine, my success rate

22   was continuous.  Andy spent a lot of time in my office doing

23   things that were unreasonable, which I don't believe we should

24   go into here, and may be not appropriate.

25          THE COURT:  No, we shouldn't get into the merits

1    today.

2          MR. GRIFFITHS:  Okay.  Well, you know, the things that

3    Andy did --

4          THE COURT:  We should not get into the merits.

5          MR. GRIFFITHS:  Oh, we should not get into the merits.

6    Oh, then I will skip along there.

7          You know, and as I look at this, one thing that's very

8    clear during bankruptcy, they could afford to settle it.  Okay?

9    That's clear.  And my career has been damaged.  I no longer

10   have the respect of the industry.

11         When you leave the company like that, and my

12   termination -- my termination letter does not specify why I am

13   leaving, it -- I received it over Christmas, which is pretty

14   painful, and they retroactively showed it as December 17th.

15   And then I got my bank account, and they reversed all previous

16   payments in December.

17         And you know, in addition -- yeah.  You know, my wife

18   tried to join Northwest because she missed the things that we

19   did together.  We got divorced.

20         THE COURT:  Well --

21         MR. GRIFFITHS:  That's pretty much my summary on this

22   issue.

23         THE COURT:  All right.  Now there is a second claim in

24   which you're seeking a small amount --

25         MR. GRIFFITHS:  Yes.

1       THE COURT:  -- for costs, postage, other expenses.

2  Ordinarily, the costs that a creditor incurs in connection with

3  filing a claim and similar activities is not a cost of

4  administration of the estate.  I gather that's the nature of

5  your second small claim.  Is that right?

6       MR. GRIFFITHS:  It is, and --

7       THE COURT:  Tell me --

8       MR. GRIFFITHS:  And --

9       THE COURT:  -- is it for anything other than

10 responding to their motion?

11      MR. GRIFFITHS:  No, it is not, and I would concede on

12 that one, Your Honor.  I don't believe -- I can concede on that

13 number.

14      THE COURT:  All right.

15      MR. GRIFFITHS:  I would like -- I would like

16 compensation for my trip to New York.

17      THE COURT:  Well, it really follows the same

18 principle.

19      MR. GRIFFITHS:  Okay.

20      THE COURT:  But what I'm going to do is -- and let me

21 see whether the debtors has anything further to say.

22      MR. LEAMON:  No, Your Honor.

23      THE COURT:  All right.

24      MR. LEAMON:  I was going to address the admin. claim,

25 but Your Honor did that.

1          THE COURT:  Judge Magnuson's decision is very clear

2     that this matter should have gone to arbitration years ago.

3     And under applicable authority, I think it should be arbitrated

4     now.  Now I don't know exactly what the procedures are because

5     I think this was an internal form of arbitration within

6     Northwest, but it should be followed to the extent it can be

7     followed.

8          Northwest can argue to the arbitrator that they've

9     been damaged by the delay, what they call "laches," l-a-c-h-e-

10    s, it's a legal term for delay.  And if they've been damaged,

11    then they can claim it's too late.  You can certainly argue to

12    the contrary.  And I would urge you, if you're serious about

13    pursuing your claim, to consider retaining a lawyer who can

14    represent you.  On the other hand, arbitration is designed to

15    be available to individuals without a lawyer.

16         That's neither here, nor there.  That is for the

17    parties to proceed.  As I said, they can argue laches; you can

18    certainly argue against it, and that you've been diligent, and

19    that they haven't been damaged because they have employees who

20    are presently on staff, who can respond to your complaint, or

21    they can access the records and access former employees.

22         The only thing this Court will do is set a deadline

23    for your proceeding with the arbitration, because while the

24    arbitration proceeds, the debtor does have to reserve for your

25    claim, and that prevents them from resolving all their claims

1    and distributing all of the stock that's being distributed to

2    creditors.

3          So it seems to me that you should have a reasonable

4    period to commence the arbitration, and then the arbitration

5    can run its course, but that you should obviously be diligent

6    in pursuing it.  Would sixty days be a reasonable period for

7    you to pursue the arbitration by sending a letter to Northwest

8    -- and counsel will give you his name -- demanding that these

9    matters be arbitrated, setting forth your claims and asking

10   that a date be set at a convenient location for the

11   arbitration?

12         MR. GRIFFITHS:  Yes, Your Honor.

13         THE COURT:  All right.  And the arbitration, I

14   understand, is pursuant not to the procedures of the American

15   Arbitration Association, but to some individualized procedures.

16   Is that right?

17         MR. LEAMON:  Yes, Your Honor.

18         THE COURT:  As far as you know?

19         MR. LEAMON:  Yes, Your Honor.

20         THE COURT:  All right.  Well, let's say -- I'll ask

21   the debtors then to settle on you, show you, and then send to

22   me an order providing that you'll have sixty days to commence

23   arbitration and proceed then diligently with arbitration; and

24   that all parties' rights before the arbitrator are reserved, in

25   terms of arguing delay and the like.

1            You can also argue to the arbitrator that you should

2   get the costs, additional costs.  But I think, in the mean

3   time, we'll have to eliminate your second proof of claim; that

4   is, for administrative claims against the estate.

5            MR. GRIFFITHS:  Thank you, Your Honor.

6            THE COURT:  All right.  Thank you.

7            Next matter?  Shall we do the -- what is the motion

8   for relief from the stay?  Whose matter is that?  I thought you

9   mentioned that --

10            MR. LEAMON:  It was on the agenda, Your Honor.  I

11   guess perhaps that party is not --

12            THE COURT:  I didn't see it.  Is there a motion -- is

13   anyone here to argue a motion for relief from the stay?

14       (No verbal response.)

15            THE COURT:  All right.  That's easy.  I had a <u>Tower</u>

16   motion for relief from the stay that -- in <u>Tower Automotive</u>,

17   another case altogether.  So it may be that chambers called you

18   about it, thinking it was a <u>Northwest</u> matter, rather than a

19   <u>Tower</u> matter.  All right.

20            MR. LEAMON:  Yes, Your Honor.  In that case --

21            THE COURT:  That one we've been most successful on.

22            MR. LEAMON:  Yes, Your Honor.

23            THE COURT:  And in record time.

24       (Laughter.)

25            THE COURT:  Judging by the amount of material I have

1  on Capp Seville, we'll be here for the next two weeks, so maybe

2  we should take Wilmington Trust first.

3          MR. LEAMON:  Yes, Your Honor.  I believe the debtor,

4  as stated in the November 25th hearing [sic], we don't really

5  have an active position in the carried-over --

6          THE COURT:  You don't have a dog in this fight.

7          MR. LEAMON:  Exactly, Your Honor.  So I will turn the

8  podium over to --

9          THE COURT:  Well, you just don't want a duplicative

10 claim.

11         MR. LEAMON:  Yes, Your Honor.

12         MR. COHEN:  Good afternoon, Your Honor.  David Cohen

13 with Milbank Tweed, here on behalf of the Hancock entities and

14 Wells Fargo.

15         As the Court may recall, the issue between Penta and

16 Hancock with respect to the debtors' twenty-fifth omnibus

17 objection is whether the debtor owns the rejection -- or

18 rather, Penta owns the rejection claim, or Hancock does.  And

19 I'd like to give you a report of where we are and where we

20 aren't from the last hearing.

21         THE COURT:  I'd much rather here where you are, rather

22 than where you aren't.

23         MR. COHEN:  Then that's where I'll start.

24         We have given Penta --

25         THE COURT:  Let me -- Mr. Griffiths, you can stay; or,

1    if not, counsel -- do you have counsel's card so you know who

2    to communicate with?

3              MR. GRIFFITHS:  No, I don't.

4              THE COURT:  And you certainly don't have to stay for

5    the rest if you don't want to.

6              All right.  Please go ahead.

7              MR. COHEN:  We have given Penta the accounting, as the

8    Court instructed us to do at the last hearing.  We've also

9    given Penta the subsequent bill of sale.  Those documents are

10   confidential.  We're going to file a motion this afternoon to

11   file them with the Court under seal, and then we'll have those

12   with the Court.

13             What the document, the accounting in particular, does

14   confirm is that there is equity in the claim, so that the

15   amount of the rejection damages claim is in excess of the debt,

16   which we believe Hancock is entitled to be paid under the

17   operative documents.

18             We have a little bit of a disagreement on the

19   accounting that we're working out with Penta, and I think we

20   can reach agreement as to what the accounting is going to be,

21   and we'll file the bill of sale to the subsequent purchaser

22   with the Court this afternoon.

23             So what it leaves us with is, I think, where the Court

24   was at the last hearing, is the legal issue as to whether and

25   when the lease was terminated.  And I think that there needs to

1    be a little bit of discovery there; very limited factual

2    discovery, because there was a subsequent proceeding, there

3    were FAA rejection notices that were filed by separate counsel.

4    The subsequent purchaser, Northwest, and Wilmington signed

5    certain documents.

6         We've had conversations with Penta over the last

7    month, trying to avoid discovery and reach a consensual

8    resolution.  We're not there, and we may not be able to get

9    there.  But I don't think that, without the evidentiary record,

10    that the issue is ripe for adjudication today.  So maybe a

11    short adjournment to the next hearing.  We can either do the

12    discovery or reach the consensual resolution.  You know, we

13    could come back in a month and have an evidentiary hearing on

14    the termination issue, or maybe the whole thing could go away.

15         THE COURT:  Tell me how the termination issue affects

16    the result.  It affects your argument that you bought the

17    rejection claim at the foreclosure sale.  Is that the

18    intersection?

19         MR. COHEN:  That is the intersection.  And what Penta

20    has argued is that the lease terminated either with the

21    debtors' filing of the motion for authority to reject the lease

22    shortly after it filed for Chapter 11 protection, or that the

23    lease was terminated when the notice of acceleration was issued

24    approximately six weeks before the foreclosure sale.

25         We have other dates which we believe establish that,

1    at the foreclosure sale and at the time of the execution of the

2    bill of sale, the lease was still in effect based on some of

3    the actions Penta took, some of the representations, and some

4    of the filings.  And I think what we would need to do is very

5    limited discovery as to why those positions were taken after

6    the foreclosure sale, if it was Penta's position that the lease

7    had already terminated.

8            THE COURT:  And they could take discovery on the

9    question of the notice provided to the world of exactly what

10   was being sold and what you thought you were selling when you

11   wrote the foreclosure documents that you did.

12           MR. COHEN:  Certainly.  Discovery, I think, always has

13   to be two-sided, and if they wanted --

14           THE COURT:  I'm not suggesting that that's the way to

15   go, necessarily.

16           MR. COHEN:  If they wanted that discovery --

17           THE COURT:  They may not be -- they may not wish to

18   pursue the issue any more than the papers say what they say.  I

19   don't --

20           MR. COHEN:  I thought --

21           THE COURT:  I didn't mean to suggest that there should

22   be further discovery on either side, but ... all right.

23           MR. COHEN:  I thought the Court was fairly clear on

24   what the notices provided and didn't.

25           THE COURT:  I read them, and they are what they are,

1   which leads to the question as to what information the

2   additional discovery could demonstrate.

3          MR. COHEN:  What they could demonstrate is what --

4   whether the lease was in effect.

5          It's Penta's argument, essentially, that because the

6   lease was terminated prior to foreclosure -- as I understand

7   the argument -- it couldn't have been sold at foreclosure in

8   any event because it was a terminated lease; and even if it --

9   and even going forward, when Penta -- or Wilmington Trust,

10  rather, executed the bill of sale conveying all of its right,

11  title, and interest, it couldn't have conveyed right, title,

12  and interest under the lease because it was terminated.  So I

13  think it goes --

14         THE COURT:  Then their final argument is that, even if

15  it hadn't been terminated, and even if there were rejection

16  damages that could have been sold at a foreclosure sale, that

17  they weren't because your notice didn't state clearly enough

18  that they were being sold, and that the -- and that the sale

19  was an, if you will, all-or-nothing proposition.

20         MR. COHEN:  Correct.  That subsequent to the

21  foreclosure sale, they executed a bill of sale that conveyed

22  all right, title, and interest.  And it would be our position

23  that included the rejection, whether or not the notice of

24  foreclosure and what was actually bid on at the foreclosure.

25         And I think when the Court sees the accounting, one of

1    the concerns that the Court had when we were here a month ago

2    was:  Did the credit bid in any way reflect the market value of

3    the aircraft, and were those two things somehow related?  And I

4    think when we provide the Court with the accounting this

5    afternoon -- and I don't think either Penta -- I don't know

6    that Wilmington Trust has the accounting, but Penta is the

7    beneficial interest here.  Penta disputes that the amount paid

8    by Hancock at the foreclosure and the subsequent sale reflects

9    that the bid at foreclosure was consistent with the market

10   value of the plane, which was the Court's other question the

11   last time we were here.

12            THE COURT:  All right.

13            MR. COHEN:  Thank you, Your Honor.

14            THE COURT:  Thank you.

15            MR. MACAULEY:  Good morning, Your Honor.  Thomas

16   Macauley for Penta.

17            Your Honor, Mr. Cohen and I had spoken about the last

18   hearing, and it's our understanding that the Court decided the

19   notice issue and said clearly that there was no notice with

20   respect to the foreclosure; but that the Court left open the

21   issue with respect to whether, by operation of law, the bill of

22   sale somehow conveyed the lease rejection claim in connection

23   with the public sale.

24            Our argument at the time was that the Court on this

25   record could decide that issue.  There were some state court

1     cases that John Hancock had cited that there was a -- that the

2     -- you know, the sale of the aircraft includes the lease, as

3     well.  Our argument is that the lease terminated well

4     beforehand, and that those cases are simply inapplicable for

5     that reason.

6          Now we had argued there were two reasons, as Mr. Cohen

7     had alluded to, why the lease terminated prior to the sale:

8          First, the aircraft was subject -- the aircraft lease

9     was subject to a rejection motion filed on the first day.  This

10    was the aircraft that was -- the air frame was in Mobile, and

11    the engines were in Arizona.  And so the Court -- the debtor

12    dropped it like a hot potato.  And our argument was that, well,

13    the order -- the order rejecting the lease not only rejected

14    the lease, but allowed the debtor to abandon the aircraft.  And

15    by the fact of rejection, plus abandonment, we view it as

16    sufficient to cancel or terminate the lease.

17         The other issue we raised was that on January 31st of

18    2006, approximately -- a little over thirty days before the

19    public sale, the indenture trustee sent a notice of

20    acceleration, which we discussed at length at the September

21    25th hearing.  And in that notice of acceleration the indenture

22    trustee specifically states that the indenture trustee, quote,

23    "hereby terminates the lease."

24         And so while I understand there may be an interest in

25    discovery from John Hancock's part, we believe that the issue

1   on whether, by operation of law, the lease claim goes with the

2   aircraft sale is -- the record is sufficient for the Court to

3   decide that issue at this point.

4           I will say the subsequent bill of sale, which was

5   produced to us, does have the exact same language as the bill

6   of sale that Wilmington Trust executed in favor of the

7   indenture trustee.  So the same language that they are arguing

8   operates as an operation of law, they used for a bill of sale

9   that happened approximately twenty days later.

10          Finally, the argument that they raise with respect to

11  our proof of claim I want to address.  With respect to the --

12  we had a proof of claim or a rejection of proof of claim,

13  provided for up through the sale of the aircraft.  And John

14  Hancock says, well, you're arguing that you're seeking unpaid

15  rent through the sale of the aircraft, so you're effectively

16  admitting or suggesting that the lease was still in existence.

17          I would submit, Your Honor, that there is a difference

18  between a remedy versus the actual executory obligations that

19  operate under a lease.  As the UCC indicates -- and I would

20  cite Article 2A, Section 505.  Cancellation of a lease

21  discharges the executory obligations on the lease, but it does

22  not cut off the remedy.  And I think it's pretty clear under --

23  I think it's -- the law is pretty clear that if a lessor has a

24  claim for rejection damages or breach of contract under a

25  lease, and then goes to sell the goods or the property or

1    whatnot, that the lessor cannot submit a claim for future rent

2    beyond the sale because the lessor doesn't own the property

3    anymore.  That's, I think, pretty simple.  But the fact that

4    the lease terminated before the sale doesn't cut off the

5    lessor's claim, and I think the UCC is pretty clear on that, as

6    well.

7           The UCC also states, as a measure of damages -- and I

8    would cite Article 2A, Section 527 -- that the lessor, as part

9    of its measure of damages, can sell the goods, but keeps the

10   claim for damages.  It doesn't automatically lose the claim for

11   damages by selling the goods.

12          So we would submit that -- Your Honor, that the record

13   is sufficient in view of, I think, the stipulation, A, that

14   there is equity in the claim beyond the -- beyond the amount

15   that the debt is claiming, in view of the current stock price

16   that Northwest is trading at; and also, that the bills of sale

17   are a mirror image of each other between the bill of sale with

18   respect to the foreclosure sale, and then with respect to the

19   subsequent sale.

20          And I don't know if there are any other pieces of the

21   record that Your Honor would view as necessary --

22          THE COURT:  Well, how do you propose we proceed from

23   here?  They want to take, they say, limited discovery, and then

24   I'm not sure exactly what happens next, other than perhaps to

25   submit the matter to me for decision.

30

1          MR. MACAULEY:  Well, I mean, one concern, Your Honor,

2    is that -- and I will say -- I will tell you, one issue that we

3    are going to have with the accounting is that there's a -- you

4    know, there's a large chunk of it for attorneys' fees.  And

5    under the indenture, the owner trustee is responsible for

6    reasonable attorneys' fees.  And we don't necessarily think

7    that the argument that they tried to foreclose on this lease

8    claim is reasonable, and we're going to have an issue with

9    that.

10          So I hate to sort of go down a road of discovery,

11   which I don't think is necessary because our arguments, both

12   with respect to the debtors' actions to terminate the lease and

13   then the indenture trustee's action to terminate the lease,

14   those are dispositive.  And so you would only get to a

15   discovery issue rased by John Hancock if you were to rule no on

16   both of those.  And so I would submit that the issue is ripe

17   for decision at this point.

18          THE COURT:  All right.

19          MR. MACAULEY:  Thank you, Your Honor.

20          THE COURT:  How do I get to that happy day?

21          MR. MACAULEY:  Well, you have --

22          THE COURT:  Let me make a suggestion.

23          MR. MACAULEY:  Absolutely.

24          THE COURT:  Mr. Cohen suggested that additional papers

25   be filed this afternoon.  I don't think I need them this

1  afternoon.

2        Why don't I ask the parties to stipulate to what they

3  can; to all of the facts and, if you can, the documents that

4  you believe are needed to resolve any open items; and that we

5  have a reasonable time to get as far as you can.  That should

6  clarify exactly what facts can't be stipulated to, if any.  You

7  can have a reasonable time for discovery, if you need it,

8  keeping in mind that it's expensive and may be, at the end of

9  the day, self-defeating.

10        And then if there are any open issues, I should also

11  be informed of how long I need a hearing to resolve them.  From

12  what you've said, there shouldn't be any, in terms of your

13  argument.  I don't know whether Mr. Cohen will have any or not.

14  And I don't know what that period of time should be, but -- and

15  I'm not sure we need another hearing.  Maybe I just need the

16  issue submitted to me for a decision.  But I'll certainly have

17  another hearing if the parties think it would be useful.

18        MR. MACAULEY:  Your Honor, the way that you had left

19  it at the last hearing, as you had said on the record, you were

20  going to go back and look at some decisions that John Hancock

21  had cited, and that you were looking for these additional

22  pieces of evidence that John Hancock is ready to submit into

23  the record, albeit under seal or --

24        THE COURT:  All right.  I think you should just sign a

25  stock confidentiality agreement, and we'll keep the documents

1   confidential, although for what purpose, I don't know, but that

2   doesn't matter.

3           MR. MACAULEY:  Yeah.  This was just raised to me this

4   morning --

5           THE COURT:  It doesn't matter.

6           MR. MACAULEY:  -- and we don't have a problem, you

7   know, with that prospect, so ...

8           THE COURT:  All right.  Let me hear from Milbank.

9           MR. COHEN:  Just a couple of points in response to Mr.

10  Macauley's comments, Your Honor.

11          First, on the notion that the debtors' rejection

12  motion somehow terminated that lease, I think we dealt with

13  that issue in our August 10th brief at Page 4, and I won't

14  reargue that here.

15          As to the idea that the aircraft were abandoned,

16  there's no evidence in the record on that point.  But I think

17  that the rejection motion and the cases are pretty clear it

18  does not, in and of itself, effect a termination.

19          On the acceleration point -- and this is really where

20  I think Penta and Hancock disagree, is Penta takes the position

21  that the acceleration notice terminated the lease.  The limited

22  discovery we need relates to the actions of Wilmington Trust as

23  owner trustee after the foreclosure sale during this period

24  that Hancock owned the plane and was selling it to an unrelated

25  third party; where Northwest, as the debtors, and Wilmington

1  Trust, as the owner trustee, continued to take the position

2  that the lease was in effect.  And so while the bills of sale,

3  when Hancock owned the plane and when the plane was

4  subsequently sold, were out there, they were continuing to make

5  written representations and take in writing the view that the

6  lease was in effect, which I think undercuts significantly, if

7  not completely, the argument that somehow the lease terminated

8  in January.  Those were admissions by both the debtors and by

9  the owner trustee.

10      I think, in terms of how we get to the finish line,

11  the process that the Court outlined makes sense.  Hancock,

12  Milbank, me, have no interest in working up legal fees for the

13  sake of working up legal fees; it's one of the reasons that we

14  didn't proceed with discovery while we were having

15  conversations and trying to work through the accounting and

16  bill of sale issues between the last hearing and now.

17      And I think it makes sense for Penta, Wilmington

18  Trust, and Hancock to sit down in an orderly way and say, this

19  is what we agree on, this is what we can stipulate.  And there

20  are documents that have not been exchanged among the parties

21  that we can exchange at this point.  And without getting into

22  document demands and depositions, which I agree are expensive,

23  and I don't think we need at this point, we may be able to

24  package up the case and give the Court a final submission.  And

25  we'll know, once we go through that exercise, whether we need

1    another hearing or not.  It may well be that we're able to give

2    the Court, these are the stipulated facts, and here's our

3    arguments on the law, and the Court would be able to decide it

4    on the papers.  I think that that could happen fairly quickly.

5    I'm not sure what dates the Court has in mind for this.

6            THE COURT:  How long would you suggest for the first

7    stage; i.e., an effort to stipulate as to the facts and

8    determine what is still disputed from a factual perspective?

9            MR. COHEN:  Two weeks?  I think we could have that

10   submission in two weeks.

11           THE COURT:  Well, I don't need the submission.  I just

12   need you to --

13           MR. COHEN:  Oh, okay.

14           THE COURT:  I need, I think, you to --

15           MR. COHEN:  I think we could do that in two weeks.

16           THE COURT:  All right.

17           MR. COHEN:  During that process, I think by necessity

18   -- and it will be obvious what discovery we would need to

19   complete, if any, and recognizing that there's a holiday in the

20   middle of that, maybe we would have an additional -- three

21   weeks after that point, if there was any discovery, to get that

22   done in three weeks.  And so we will be done, really, with this

23   whole exercise, that's five weeks.  Give us a week after that

24   to put together papers, I think we could have everything

25   submitted in six weeks.

1          THE COURT:  All right.

2          MR. COHEN:  The marshal downstairs took my Blackberry,

3   which has my calendar, so I don't have the specific --

4          THE COURT:  No, I understand the problem.

5          MR. COHEN:  I don't have the specific dates.  But

6   roughly, I think we could do it in fairly short order, Your

7   Honor.

8          THE COURT:  All right.  We'll do that then.  We'll

9   give a period of two weeks to agree on a stipulation as to

10  facts.  Three additional weeks, then, for discovery, one

11  additional week to file a statement -- it can be a brief

12  statement from both sides -- as to the issues remaining and the

13  issues to be decided by the Court.

14         MR. COHEN:  And then responses to each other's

15  submission, if the Court will just take both of those.

16         THE COURT:  If that seems adequate, I'll then take the

17  matter under submission.

18         MR. MACAULEY:  Yeah, if --

19         THE COURT:  If you feel at the end of the process that

20  you need an evidentiary hearing on any material disputed facts,

21  you should let me know, and I'll schedule it.  You can call

22  chambers and call Ms. Azzaro, and I'll schedule that hearing.

23         MR. COHEN:  Thank you, Your Honor.  I think that makes

24  a lot of sense.

25         THE COURT:  That will do it.  And then I'll just take

1    the matter under submission or -- yeah, very good.

2              MR. COHEN:  Thank you, Your Honor.

3              THE COURT:  So you'll both have an opportunity to put

4    in a brief summary of where you are, what the additional

5    documents and facts show, and in the mean time, you can file a

6    stipulation of confidentiality.

7              MR. COHEN:  Thank you, Your Honor.

8              THE COURT:  All right.  Thank you.

9              All right.  I think we're now up to Capp Seville.

10             MR. MILLER:  Excuse me, Your Honor.  Stephen Miller on

11   behalf of Wilmington Trust Company.  As our matter is

12   concluded, can I sign off now?

13             THE COURT:  Certainly.

14             MR. MILLER:  Thank you, Your Honor.

15             MR. LEAMON:  Your Honor, Mr. Eyers, co-counsel, will

16   be taking it from this point forward, Your Honor.

17             THE COURT:  All right.

18             MR. EYERS:  Thank you, Your Honor.  Excuse me.  May it

19   please the Court and counsel, Jeff Eyers appearing on behalf of

20   the debtor Northwest Airlines in this matter.

21             Northwest Airlines is moving for summary judgment,

22   partial summary --

23             THE COURT:  I've read the papers, I've read all of the

24   papers.  But I'll be happy to hear your argument, but --

25             MR. EYERS:  Let me move down a page, Your Honor.

1       THE COURT:  You needn't repeat what's in the papers.

2       MR. EYERS:  Certainly, Your Honor.

3       This dispute arose in 2006, after Northwest filed for

4   bankruptcy petition, when Capp Seville decided to sell the

5   hotel.  In April of 2006, Northwest received a letter from

6   Larken stating that Capp Seville and Larken have agreed that

7   the best result will come from a sale of the hotel.

8       Notably, Your Honor, Capp Seville has never argued

9   that there was any legal justification for terminating the

10  long-term hotel agreements that are at issue in this adversary

11  proceeding.  Instead, through this litigation and in their

12  response to our motion, they attempt to deny the agency

13  relationship created by the management agreement; they attempt

14  to distance themselves from Larken, notwithstanding the

15  agreement to sell the hotel; and they attempt to distinguish

16  themselves from the hotel, notwithstanding their own subsequent

17  sale of that very same hotel to La Quinta.

18      THE COURT:  Now I understand that Larken was, in

19  effect, discharged as the manager some two years before it

20  would have -- its contract would have terminated in the

21  ordinary course.  Is that right?

22      MR. EYERS:  I believe it was less than two years.  But

23  my understanding is, effectively, when Capp sold the hotel,

24  Larken's relationship with Capp was terminated.  I've never

25  seen a formal notice of termination of that relationship, Your

1    Honor.

2            THE COURT:  All right.

3            MR. EYERS:  Approximately one and a half years ago,

4    when this case was first filed, counsel for Capp stood before

5    this Court and represented to this Court that the relationship

6    between Larken and Capp was that of landlord and tenant, a

7    lease relationship.  We now know that that's not true.  And

8    Larken -- I'm sorry -- Capp has now admitted, as they must,

9    that Larken was an agent of the hotel.

10            Their response at this point, Your Honor, is, okay,

11    Larken was an agent of the hotel, but not of Capp, and that's

12    simply nonsensical.  There was no separate entity.  The

13    agreement was between Capp and Larken.  Larken was Capp's agent

14    for purposes of the hotel.

15            The other argument they make with respect to the

16    agreement itself, Your Honor, is that construction is an

17    argument that the limitations language in 5(e) somehow limits

18    the whole agreement, and somehow voids the express grant of

19    agency powers in the separate part of the agreement.  And in

20    our brief, we go through the rules of contract construction,

21    and I won't repeat those here.

22            But I think the best way to illustrate the point that

23    that clause and that limitations language was limited to the

24    service contracts and space leases referenced there, is to look

25    at Exhibit B that's specifically referenced in that paragraph.

1  And Exhibit B is attached to the original management agreement,

2  I believe it's Exhibit 8 to my declaration.  But if you look at

3  that list, it perfectly explains what types of contracts and

4  space leases they're referring to:  Telephones, computers, TVs,

5  movie channels, elevators, rubbish, pest control, game

6  machines, airport advertising -- which would be a space lease -

7  - National Check Register, and Telecheck.  There is no way to

8  construe the contract as a whole and read into that limitation

9  language an express limitation on Capp's ability -- or Larken's

10  ability to bind Capp that would void the entire agreement and

11  frustrate the purpose of the agreement.

12          THE COURT:  Now you're discussing or arguing what the

13  lawyers would call "actual authority."

14          MR. EYERS:  I am, Your Honor.

15          THE COURT:  You also, at least in your initial papers,

16  refer to apparent authority.  Do you proceed on apparent

17  authority or just on actual authority for purposes of the

18  motions before the Court?

19          MR. EYERS:  For purposes of the motion before the

20  Court, I'm only going to discuss actual authority, Your Honor.

21          THE COURT:  All right.  That, I suppose, simplifies

22  things by some period of time.  Although judging by the papers

23  I have before me, that may be a forlorn hope.

24          MR. EYERS:  Your Honor, I think the volume of those

25  papers reflects one single argument on the part of Capp

1    Seville.  Capp Seville actually suggests to this Court that

2    Minnesota law is unique.  It must be the only state in the

3    United States that somehow allows extrinsic evidence -- a court

4    to consider extrinsic evidence in the construction of an

5    unambiguous contract, and that's simply not the case, Your

6    Honor.

7         THE COURT:  Well, they say I should consider the

8    course of dealings --

9         MR. EYERS:  Well --

10         THE COURT:  -- between the parties.

11         MR. EYERS:  And we've cited cases in our brief, Your

12    Honor, that make it clear that that's not the case.  I'd like

13    to talk a minute about the cases and the manner in which Capp

14    cites Minnesota law.

15         We cite the Blattner case for the noncontroversial

16    proposition that extrinsic evidence is not admissible to

17    construe an unambiguous contract.  In their brief, they say:

18         "Northwest mis-cites Blattner as stating that

19         extrinsic evidence is only relevant if there is

20         ambiguity in the contract.  Rather, Minnesota law

21         holds that the parties' conduct and course of dealing

22         is generally relevant."

23         What Davis actually says, Your Honor, is:

24         "Only if the contract is ambiguous will the Court

25         consider extrinsic evidence to aid in construction."

1          In their reply brief, they selectively quote from the

2    cases and leave out the beginning phrase, which says:

3              "When there is ambiguity or a contract is reasonably

4              susceptible to multiple meanings."

5          There are no cases cited, and I'm not aware of any

6    cases involving Minnesota law, Your Honor, that says that

7    extrinsic evidence is admissible to construe an unambiguous

8    contract.  In connection with this issue -- and, Your Honor,

9    that really goes to the volumes of paper you discussed.

10         Once that issue is decided, all of that evidence, all

11   of that self-serving testimony becomes irrelevant, and the

12   Court --

13         THE COURT:  Well, does it, in this sense?  If a

14   disclosed principal gave certain authority to its agent --

15         MR. EYERS:  "A disclosed," Your Honor?

16         THE COURT:  Yeah, a disclosed principal gave certain

17   authority to the agent, and gave authority to do exactly what

18   was at issue in a written agreement, but the third party

19   dealing with the agent knew that that authority had somehow

20   been modified or had been limited for whatever reason.  Would

21   the third party have the right to rely on the written grant of

22   actual authority, you know, with knowledge of the fact that

23   that authority had been limited?

24         MR. EYERS:  Your Honor, I think the answer is no, but

25   for a different reason than you're suggesting.  I think if

1    actual authority is limited, then there is a limit on actual

2    authority; and, by virtue of that limit, there is no authority

3    to do whatever is beyond those limits.  It's not a question of

4    whether or not the third party knew of those limits or could

5    rely on an earlier agreement.  You simply create a scenario

6    where the actual authority has been limited.

7            THE COURT:  All right.

8            MR. EYERS:  With respect to extrinsic evidence, Your

9    Honor, in their reply brief Capp also raised one new issue that

10   I'd like to address briefly, and that is the suggestion that

11   the stranger exception to the parol evidence rule applies here,

12   and that because Northwest Airlines is not a party to the

13   contract, the parol evidence rule does not apply.  And that's

14   simply incorrect.

15           We haven't gotten the chance to address this, Your

16   Honor, but there are a long line of cases in Minnesota law

17   explaining that where, as here, the third party is making

18   claims or asserting rights based on the contract at issue, the

19   parol evidence rule does apply, and the parties -- neither

20   party is allowed to offer extrinsic evidence in support of a

21   different construction.

22           Your Honor, I've got those cases cited in a letter to

23   the Court, or I can read them into the record, but we didn't

24   have a chance to respond to that issue.  And we certainly

25   wanted to make the Court aware of the fact that there is

1    evidence explaining, in this situation, the parol evidence rule

2    does apply.

3         THE COURT:  All right.  You can put that letter in the

4    record.

5         MR. EYERS:  Thank you, Your Honor.

6         If we turn to the hotel agreements themselves,

7    agreements that were executed by Larken officers on behalf of

8    and as agents of the hotel -- excuse me -- the issue, as a

9    matter of law, becomes clear that Larken was executing those

10   contracts on behalf of its principal Capp.

11        Now Capp's response to this is to suggest, as with the

12   management agreement, that there's some distinction between the

13   owner and the hotel with respect to the hotel agreements, and

14   that's simply not the case, Your Honor.  And what we point out

15   in our brief is that the only references to the hotel owner and

16   the hotel agreements themselves are these parentheticals in one

17   paragraph, which refers to a contingent situation, where the

18   hotel owners is not a party to the agreement.

19        Those agreements do not, as Capp suggests, separately

20   define "owner" from "hotel," thereby compelling a conclusion

21   that they're different entities.  To the contrary, they carve

22   out a small exception for those situations where the hotel is

23   not the owner.  And then the signature block that Capp keeps

24   referring to also makes it clear that that signature block is

25   not a block where the owner signs on as a party.  It's a "I

1    hereby consent to these terms" type of signature block, which

2    is consistent with the language of the agreement.  It's those

3    situations where the owner is not a party to the agreement,

4    where the owner is nonetheless asked to sign on to the

5    agreement because it includes those terms about running with

6    the land.

7          One small issue here, Your Honor.  Capp raises this

8    issue over and over in its brief.  I have made clear to Capp's

9    counsel that Northwest is not claiming those agreements run

10   with the land.  I don't know why we talk about that in the

11   briefs.  I made it clear to their counsel that's no longer an

12   issue.  They're right, we did not register the agreements as

13   you have to under Torrents Property (phonetic).  We don't need

14   to prove that they run with the land in order to prove out

15   claim, but that is not an issue in this case, and I'm not sure

16   why we spent so much time talking about it in the briefs.

17         The only other issue with respect to the hotel

18   agreements themselves, Your Honor, is this notion -- in our

19   briefs we made it clear that because Capp admits that Larken

20   was an agent for the hotel, and because Capp admits that Larken

21   had no property interest in the hotel, Larken could not, as a

22   matter of law, have executed those agreements in any other

23   capacity other than as a managing agent for Capp with respect

24   to the hotel.

25         And in their reply brief, Capp suggests for the first

1  time -- and they cite this case, <u>Lee</u>, involving University of

2  Minnesota, for the notion that a party without an interest in

3  the land can nonetheless grant a license.  And again, Your

4  Honor, that's simply not what that case says.  The license in

5  that case came from the owner of the land, the University of

6  Minnesota, and it simply does not support the proposition for

7  which Capp cites it.

8        Based on the admissions in the record, Your Honor:

9  The admission that Larken was an agent for the hotel; the

10  admission that Larken was authorized pursuant to the terms of

11  the hotel agreement to rent rooms and provide hotel

12  accommodations; the admission that, based on the language of

13  the hotel agreements, the entity signing them was an agent for

14  the hotel, Capp's liability is established as a matter of law.

15        Your Honor, there are cross-motions.  I would like to

16  spend two minutes briefly discussing Capp's motion.  It's not

17  based on the agreements themselves; it involves a mish-mash of

18  facts.  In order to deny that motion, I think the Court need

19  only look at the written agreements themselves.  It need only

20  look at Capp's own self-contradictory testimony about its

21  relation with Capp and whether or not Capp and Larken had to

22  approve various drafts of the agreement.

23        To deny that motion, the Court need only recognize

24  that we've got alternative bases for recovery, including

25  ratification, including apparent authority, including the

1    agency relationship that existed as a matter of fact outside

2    the terms of the agreements.  It's not a summary judgment

3    motion, it wasn't properly brought for a proper purpose, and it

4    should be summarily denied, Your Honor.

5         THE COURT:  Now just tell me about Exhibit I to your

6    declaration.

7         MR. EYERS:  Is that the hotel -- is that the hotel

8    agreement?

9         THE COURT:  That's the HSA, the hotel services

10   agreement.

11        MR. EYERS:  And there were two of them, Your Honor.

12        THE COURT:  It's the first one --

13        MR. EYERS:  Okay.  That's fine.

14        THE COURT:  -- dated August 21, for pilots, I believe,

15   or crew.  And the signature page shows that it's signed by

16   Andrew Roberts on behalf of Northwest Airlines, Brad Cook on

17   behalf of the Clarion Hotel.  Then there's a line for

18   signature, "(Hotel Owner)" that's blank.  There's a date in

19   there, August 11, 2004.  And then there's a circle.  And your

20   copy, you gave it to me, nobody tells me anything about this

21   copy.  A circle.  And the word -- around the unsigned "hotel

22   owner" signature block, the word "remove" is there, and then on

23   the left I see "Tom" -- the name "Tom Brandt", a phone number,

24   and title, "Manager for NW Hotel Group."

25        Now does the record give me any evidence whatsoever as

1  to what those words "remove" and "Tom Brandt" mean, or shall I

2  just ignore those?

3          MR. EYERS:  I'll tell you what I know, and I'll tell

4  you what the lawyers know.  Brad Cook testified that he wrote

5  in the date, that 11 August, 2004, so that's his writing.  The

6  Bates --

7          THE COURT:  All right.

8          MR. EYERS:  The Bates Numbers at the bottom of this

9  agreement reflect the fact that this copy of the agreement came

10  from Larken's own files.  I believe, Your Honor, that this is

11  the only copy of this agreement that includes this mysterious

12  circle and the word "remove."  It wasn't in our files, it

13  wasn't -- I don't believe it was in Capp's files.  And I

14  believe that just about every witness that ever touched these

15  agreements has been asked about that word -- that circle and

16  the word "remove," and no one is taking credit for it.

17          THE COURT:  And what is the "Tom Brandt" -- how did

18  that get on this copy, do you know?

19          MR. EYERS:  Your Honor, my recollection is -- and I'm

20  not positive about this -- is that a Larken employee testified

21  that she received that name as a contact person for Northwest

22  Airlines -- that is -- Tom Brandt is a Northwest employee, and

23  that's a Northwest Airlines phone number -- and that someone

24  received Mr. Brandt's name as a contact person or a source for

25  information and wrote that on there.  I believe it was an

1    administrative assistant at Larken, but I'm not positive, Your

2    Honor.

3            THE COURT:  All right.  And there are other copies of

4    this document that show the two signature lines filled in, that

5    show Roberts and Cook's signatures --

6            MR. EYERS:  Yes, sir.

7            THE COURT:  -- and that don't have the "remove"

8    circle.

9            MR. EYERS:  Correct, and that don't have the "Tom

10   Brandt."  I don't think Tom Brandt is --

11           THE COURT:  That's not material -- somebody --

12           MR. EYERS:  That writing doesn't seem --

13           THE COURT:  Somebody scribbled that because it was a

14   blank piece of paper, we assume.

15           MR. EYERS:  Yes, sir.

16           THE COURT:  And I see Exhibit J, which is the other

17   HSA, doesn't have anything about "remove" on it; it just has a

18   blank undated signature line.

19           MR. EYERS:  I believe that's correct.

20           THE COURT:  Okay.

21           MR. EYERS:  And the only thing I'd point out with

22   respect to the signature block again, Your Honor, is the nature

23   of the block for the owner, which is acknowledged and consented

24   to --

25           THE COURT:  Yes.

1          MR. EYERS:  -- and not a block that would bind a

2    party.

3          THE COURT:  All right.

4          MR. EYERS:  I ran through what I had, and I appreciate

5    the Court's time.

6          THE COURT:  Thank you.

7          MR. GOROFF:  Good afternoon, Your Honor.  May it

8    please the Court, David Goroff on behalf of Capp Seville.  With

9    me today are Daniel Boerigter, who is the general outside

10   counsel for Capp, Dana Rundlof of our New York office.  And

11   also as you know, Your Honor, we have Lisa Capp in the

12   courtroom, who is an officer of Capp Seville, and Leonard

13   Horowitz by phone.

14          Your Honor, what's interesting about Mr. Eyers'

15   discussion is how little he has to say about the hotel service

16   agreements.  And there's no dispute that Northwest wants to

17   have the same outcome as against Capp as if it had signed that

18   blank signature line, which it did not, when Capp not only

19   didn't sign, but was never asked to sign, and during the

20   negotiation process given no notice about this document at all.

21   And this makes Northwest's behavior leading up to the hotel

22   service agreements nonsensical.

23          Now Northwest has told you that they're going to have

24   a response about parol evidence.  That's news to us.  They

25   haven't shared this letter they intend to produce to you, and I

1    would hope Your Honor would give us time to file a similar

2    letter in response.

3         THE COURT:  Oh, I assume you'll file a twenty-page

4    letter in response if history carries through.  I won't stop

5    you from doing it, if you want to do that, but I would hope

6    that maybe you could be brief.

7         MR. GOROFF:  Well, Your Honor, we do cite a Minnesota

8    case, though, State v. Russ --

9         THE COURT:  Don't tell me about it.  If you're going

10   to tell me about it in your response, you can tell me about it

11   then.

12        MR. GOROFF:  Well, I have that case already before

13   you, Your Honor.

14        THE COURT:  All right.

15        MR. GOROFF:  And that case says that the parol

16   evidence rule does not apply as to third parties who would

17   challenge the meaning of a contract.  It's a 1959 Minnesota

18   case.

19        We also, of course, cite the Zenith Radio Corp v.

20   Hazleltine case on that point.

21        And there's also a series of cases that say Your Honor

22   is entitled to look at the context of an agreement, what the

23   parties were thinking, what their prior behavior -- we cite the

24   Ecolab case from Minnesota and the ICC case from Minnesota.

25        And those things Northwest does not want you to look

1    at.  They don't want you to look at a long brief, and they

2    don't want you to look at exhibits, Your Honor, because it

3    shows their claim is entirely factually and legally false.

4         Northwest, for many years, has had a specialized hotel

5    department, and it has lawyers in that department who draft a

6    template that Northwest insists on using with each hotel

7    service agreement.  And that template, not only during the

8    period in question, but for many years before that, always had

9    a separate signature line for the owner; it always separately

10   used the terms "hotel" and "owner;" and it always had, in the

11   relevant time period, this Paragraph 12:  The run with the land

12   provision, which says, refers to "the owner, if not a party

13   hereto."

14        Now if the owner were always bound and the owner

15   always a party by virtue of the manager's signature, that would

16   be a nonsensical clause.  That is why Mr. Eyers doesn't want to

17   talk about running with the land, and he doesn't want you to

18   look at that particular paragraph.  But lo and behold, that

19   paragraph is in Exhibit I and it's in Exhibit J, and it's

20   revealing, under Minnesota law, as to what things meant.

21        He also cites the Blattner case.  That's a case where

22   parties are disputing their own agreement.

23        If you put yourself in Northwest's position, why does

24   it have that template, and why does it keep having it as it

25   revises other things over the years?  Why does Northwest, in at

1  least twenty predecessor agreements, go to the trouble of

2  obtaining an owner's signature, even though it didn't go to

3  that trouble here?  That includes, Your Honor, the Holiday Inn

4  agreement which directly preceded Northwest's agreement with

5  Larken for the Clarion Hotel.  Again, they want their choice,

6  both to put the signature block in and to leave it unsigned, to

7  have absolutely no legal consequence as to them.

8       Now in urging this position, Northwest ignores a broad

9  swath of Minnesota law, which Your Honor knows controls, and

10  they ignore it in their reply.  And that includes the Quintin

11  case, the Kenneally case, and others, which have long held that

12  if you have a separate signature line, and you don't get that

13  party's signature, you don't have a claim against that party.

14       And in the Kenneally case, it's significant because

15  there a secretary of a corporation was supposed to sign.  The

16  president did.  But because the secretary didn't, there were no

17  rights against the corporation itself.

18       They also ignore the Fourth Circuit Matter of Campbell

19  case, where an auctioneer had a signature by one of its

20  parties, but not in the official capacity; and, therefore, the

21  auctioning firm was not held to be bound.  They totally ignore

22  that authority, although it controls and requires summary

23  judgment for Capp.

24       They also ignore the general proposition that if you

25  choose to use two separate terms in close proximity to one

1  another -- "hotel, owner" -- they can be presumed to have

2  different meaning.  And that's the <u>Elveth Taconite</u> case.

3      They also ignore the Minnesota law that says every

4  term you choose to put in a contract is presumed to have

5  meaning.  Lawyers don't have wasteful, nonsensical clauses.

6  That's the --

7      THE COURT:  They don't?

8      MR. GOROFF:  Well, that's the Minnesota law, Your

9  Honor, that's the <u>Brookfield</u> case.

10     THE COURT:  Well, maybe Minnesota presumes that, but I

11 don't think you really want to convince me that lawyers don't

12 have wasteful, duplicative clauses in contracts, in briefs, or

13 in other legal submissions.

14     MR. GOROFF:  Well, they've never said it was a

15 wasteful, duplicative clause.

16     THE COURT:  No, I understand the principle of contract

17 construction that you're arguing.

18     MR. GOROFF:  And it's all --

19     THE COURT:  We actually have that here in New York,

20 too.

21     MR. GOROFF:  Uh-huh.  Well, there are places where

22 Minnesota law is a little bit different than New York, such as

23 on the duty of inquiry.

24     THE COURT:  I have no doubt, and at least the parties

25 do appear to have agreed on this, and that is that Minnesota

1  law controls.

2      MR. GOROFF:  And they -- again, another principle of

3  Minnesota law that Northwest doesn't address and doesn't ask

4  you to look at is the principle of contra proferentum.  They

5  drafted this, it comes from their template.

6      Natalie Goldston, whose name you've probably seen a

7  lot in the papers, who is --

8      THE COURT:  I certainly have.  But keep in mind that,

9  as you get into the fine points and the details here, I don't

10  know that you're supporting your motion -- your cross-motion

11  for summary judgment.  You may be opposing their motion for

12  summary judgment, but you've got to show me that you're

13  entitled to summary judgment on these papers, and that a trial

14  isn't necessary as to exactly what Ms. Goldston did or didn't

15  do, particularly with regard -- was she a party to the alleged

16  colloquy that we don't need to show this to Capp?

17      MR. GOROFF:  Yes, she was.

18      THE COURT:  All right.  That's an interesting

19  colloquy, but I don't know that it helps --

20      MR. GOROFF:  It's undisputed, Your Honor.

21      THE COURT:  -- my job, in terms a motion for

22  summary judgment on your part.

23      MR. GOROFF:  Well, I'll explain why it does, Your

24  Honor.

25      But what we have here are established principles that

1  "hotel" had to mean something other than owner -- that's

2  undisputed under the Elveth case -- that the blank signature

3  line meant Capp can be bound -- and that's Kenneally and

4  Quintin and Matter of Campbell -- and that the signature line

5  had to mean something -- that's Brookfield.  Your Honor, those

6  propositions require summary judgment for Capp.

7          But there is, unfortunately for the time, a lot more.

8  The undisputed facts show that Northwest had absolutely no

9  reason to assume that the manager would be binding the owner by

10  its signature.  First of all, there is nowhere in the hotel

11  agreement that it says that.  Read the HSAs.  There's nothing

12  about the manager's signature binding the owner.

13          And if you look at the admissions by the people in

14  Northwest's department -- Shapiro, Brandt, Kix (phonetic), Hass

15  -- they all say they expected the manager to sign.  They also

16  admit that they knew that managers and owners had all sorts of

17  different ownership relationship; and thus, there was no basis

18  to presume that owners always empowered managers to sign.  And

19  it's simply not true here.

20          If Northwest wanted that, it never said in its request

21  for a proposal, it never said so during the negotiations for

22  the HSAs, at any time.  This is undisputed, Your Honor.  It

23  never said so in the documents.  They never talked to Capp.

24  They never asked Larken about its authority to bind Capp.  The

25  silence and inaction on Northwest's part is truly unbelievable,

1    if they want to come here and then bind Capp to a contract.

2            And again, Northwest ignores the <u>Geldermann</u> case, the

3    <u>LaSociete Generale</u> case and others we cited in the opening

4    brief, which says it's not for Your Honor to reform the

5    contract and correct Northwest's due diligence errors.  They

6    had an opportunity, an obligation if they wanted to bind Capp,

7    to do the due diligence.

8            But it actually goes beyond this, and this is a point

9    Your Honor touched on.  Northwest had actual knowledge that

10   Larken was exceeding any power it had as to Capp.  It's

11   undisputed that Ms. Goldston and, on separate occasions Mr.

12   Cook, each told Northwest that the term that they wanted, the

13   duration term of five years, was two years beyond the contract

14   they had with Capp.  That takes this out of any argument of

15   actual agency.

16           THE COURT:  Well, or is that an issue for damages, as

17   they say it is?

18           MR. GOROFF:  No --

19           THE COURT:  They say that -- would you let me finish

20   my question before you tell me I'm wrong?

21           MR. GOROFF:  I will, Your Honor.

22           THE COURT:  Thank you.

23           They say that they can still get damages up until the

24   period of time that the Larken agency would have concluded;

25   maybe not the full period beyond that, which would have been

1    affected by the scope of Larken's authority, arguably, but that

2    they can at least get damages from the date of sale, when you

3    used the circumstances to "kick them out" -- their words, or

4    your broker's word -- and the period of time, which I think was

5    December 31st, 2006, this year, that the Larken contract would

6    have concluded if it had not been concluded earlier.

7            MR. GOROFF:  If it had not been breached --

8            THE COURT:  Terminated earlier.

9            MR. GOROFF:  -- and terminated, correct, Your Honor.

10           Now Your Honor says -- I hope -- I'll wait before

11   correcting you.  I hope Your Honor -- that's Northwest's

12   argument, and I will address it.  I hope Your Honor has not

13   accepted that argument because that argument is based on

14   Section 605 of the restatement section of agency.  And as we

15   explained in our reply, there's three elements that are

16   required to make that test, none of which Northwest satisfies.

17           First, that principle applies when you have widgets.

18   You made a contract of amount, 100, and you got 120.  It

19   doesn't apply when you're talking about a matter of years, and

20   they have no case to the contrary.

21           Second, in order to fall within Section 605, they

22   would have had to put Capp on notice of their intended

23   construction.  And of course, there was no communication at any

24   time from Northwest's side to Capp.

25           And third, Capp would have had to have taken no steps

1   to its detriment, believing it wasn't bound, which of course

2   Capp did because Capp asserted its rights to terminate Larken

3   for its nonperformance and move on to sell the hotel, which it

4   had the right to do.

5        Again, so that is the answer as to why that principle

6   doesn't apply.  You don't get to go and make an agreement with

7   an agent that says, I'm beyond my authority, and say, great,

8   let's make that agreement anyway, and then we'll blue-pencil it

9   down; that's not how the law works, and that's not how Section

10  605 [sic].

11       Everything -- and of course, again, there's a duty of

12  inquiry under Minnesota law, not only as to apparent authority,

13  but as to every party that deals with an agent, and that is the

14  Lee case we cite, Your Honor.  And they have no case to the

15  contrary.

16       And they were, in particular, put on a duty of

17  inquiry, not only because they were told that the duration of

18  the contract exceeded theirs, but because Jim Hass, Northwest's

19  signer, knew the terms here didn't make sense.  He didn't see

20  how Larken could be making a profit and could deliver what it

21  promised.  And when you're put on notice like that, you all the

22  more have a duty of inquiry, which was not followed.

23       Now Mr. Eyers, in his world, is extremely simple.  He

24  points to you Exhibit B, which I strongly hope Your Honor

25  reads, because Exhibit B --

1        THE COURT:  I certainly would have had more luck

2   reading your exhibits if you had bothered in your brief even to

3   tell me where they were, and to key them into something usable.

4   But I spent the time to figure them out, so, yes, I have read

5   some of your exhibits, at least the ones, as I went through

6   your mounds of paper, that seemed to me to be material to your

7   case.

8        MR. GOROFF:  Well, Your Honor, this is --

9        THE COURT:  So tell me what I should have read now.

10       MR. GOROFF:  This is Mr. Eyers' exhibit, Your Honor.

11       THE COURT:  All right.  Yes, I know.  You relied on

12  his.

13       MR. GOROFF:  And we tried --

14       THE COURT:  And you had some unstated group of letters

15  and numbers that keyed -- what number are you -- I have Mr.

16  Eyers' exhibits, I believe, at least his first set, in front of

17  me.

18       MR. GOROFF:  Well, Your Honor, we -- and I apologize

19  if it was inconsistent.  We tried to follow the same format

20  that Northwest did.  If there was confusion, I do apologize

21  about that.  I do think we gave a key.

22       THE COURT:  All right.  Now tell me what I should have

23  read.  Let's get to the --

24       MR. GOROFF:  Okay.  The restated management agreement.

25  And that begins by defining Capp Seville as the owner; that's

1    on the first page of the exhibit.  It separately in definitions

2    defines the "hotel;" separate term.  And the "hotel" is defined

3    as "the hotel that is operated on the property."  And the

4    "property" and the "land" are also separately defined.  The

5    "property" is defined as "the land, the improvements, and the

6    personal property."

7          And the only thing for which Larken is given an agency

8    is for the hotel.  There is nothing in this agreement that

9    gives Larken any right to act for the land, to act for the

10   property, or to act for the owner.  And even as to the hotel,

11   Your Honor, the grant of power, which comes in Section 2, which

12   is at Capp-43, Page 5, specifies that the grant of agency is

13   subject to the terms of the agreements.

14         Now if you go into Exhibit -- excuse me -- the

15   manager's obligations, one of the obligations is for them to

16   rent property and is to -- let me read this, it's at Capp 50.

17   It is as an obligation, because they're going to have to pay

18   monies back to Capp:

19         "-- to operate the hotel, which includes, without

20         limitation, the rental of rooms, the operation of the

21         kitchen and bar, the operation of the" --

22         THE COURT:  What page are you on?

23         MR. GOROFF:  Capp-50, Page 12 of the agreement, Your

24   Honor.

25         THE COURT:  All right.

1          MR. GOROFF:  And this is something that Mr. Eyers

2     didn't touch on here, but I suspect he will in his reply, which

3     they want to transpose without limitation; so that, instead of

4     being a non-exhaustive list of what the obligations are in

5     operating the hotel, which is all that this is about, that it

6     becomes a list to rent rooms without any limitation on that

7     right to rent rooms, and that's simply not what it says.

8          The agreement with Northwest, I think we can all

9     agree, is a contract.  Well, contract and leases are addressed

10    in Section 5(e), and that's at Capp-53, Page 15.  And this is

11    one that Mr. Eyers spends a huge amount of time on, but he

12    doesn't read properly.  Now he commends exhibit --

13          THE COURT:  I understand this argument of yours, the

14    including language.

15          MR. GOROFF:  Right.  And you note it's contracts and

16    leases broadly, it defines "Contracts" and "Leases" -- capital

17    C, Capital L -- but then refers to "service contracts and other

18    contracts and leases," meaning those other contracts and leases

19    are not limited to service contracts, nor are they limited to

20    the defined terms.  That's the only natural reading.

21          Mr. Eyers says, well, look at Exhibit B.  Exhibit B

22    was telephone, utility, and this.  Exhibit B were those

23    contracts that were in place prior to Larken taking over.

24    Larken was the first manager of this hotel, so you didn't have

25    prior -- or you didn't have prior hotel service agreements, you

1    had no prior agreement with Northwest, you had no prior

2    management agreement.  That is why the contracts in Exhibit B

3    are as limited as they are.

4           And if you read through Exhibit 5, it makes clear that

5    Larken may not bind Capp without Capp's authorization, which

6    indisputably was never obtained here.  And it further provides,

7    Your Honor, that Larken may not enter into a contract that

8    exceeds the duration of this contract, which Your Honor knows

9    went with all amendments only to December 31, 2007.

10           So they defaulted, they breached the agreement by

11   entering into a contract.  And you can't -- there's nowhere

12   here that says you can blue-pencil that.  It was simply a

13   violation of the contract.  And it was a violation that was

14   signaled to Northwest by both Mr. Cook and Ms. Goldston.  And

15   Northwest did nothing about it, including getting on the phone

16   or sending a letter or sending anyone to talk with Capp.

17           Now if you look at -- now, Your Honor, I'm talking

18   about course of dealing.  If you talk to Mr. Cahill, the

19   President of Larken; Mr. Kruger (phonetic), its controller; Ms.

20   Goldston, the General Manager; Mr. Cook, the Director of

21   Operations at the time, they are of a piece and as a one

22   saying, we had no authority to bind Capp, we didn't believe we

23   were doing so here, we thought we were acting on our own

24   behalf.  If you look at the depositions of Mr. Horowitz, Mr.

25   Boerigter, Mr. Van Ornem (phonetic), Ms. Capp, anyone on the

1    Capp side of the equation, they too say, Larken had no

2    authority to act for us, we didn't know that they were, we

3    didn't think they were, we did not regard ourselves as bound.

4    And Northwest has absolutely no evidence to the contrary.  The

5    facts are undisputed.

6          There was a seventeen-year course of dealing prior to

7    the HSAs under which the parties operated under that belief.

8    Now they don't want you to look at that, again, and I've

9    already told you that Northwest is an outsider to the contract,

10   and can't prevent that in the first place.  But also, when

11   we're talking about the terms of agency, there's another

12   exception to the parol evidence rule, and we cite the <u>Lee</u> case,

13   the <u>Dairy Farm</u> case, and other cases at Page 14 of our reply.

14         And of course, again, Northwest is trying to rely on a

15   document it never asked to see and it never did see.  And I ask

16   Your Honor to ponder the question:  What if this had been an

17   actual lease?  Northwest wouldn't have a leg to stand on.  And

18   yet, you know very well that they would have had the same

19   behavior of saying that the manager bound the owner.  They're

20   not saying -- they're not arguing here that this was just a

21   pure stroke of luck that they found a document they never asked

22   about, and it happens to support their theory here.

23         They're arguing -- now they've waived their apparent

24   authority claim for purposes of summary judgment.  But they

25   have no actual authority.

1          Reynolds v. Prudential, a Minnesota case, and the

2   other cases we cited in our opening brief at Page 36 make clear

3   that when you are on notice that an agent has exceeded his

4   authority -- and, Your Honor, any way you look at it, two years

5   beyond is two years beyond authority -- you cannot rely on

6   actual authority.

7          Number two, they ignore their own Cane case (phonetic)

8   and various other cases we cite, which say that, where the

9   agent itself and the principal itself do not believe that the

10  agent had powers, one should not find an agency.  There are

11  cases that they, Northwest, cites where the power was there,

12  but they didn't know that it was the legal effect of an agency.

13  But that's not the case here.  Here, you have undisputed

14  evidence that they didn't think they had the power, that they

15  always behaved as though they had the power.

16         And if you look at correspondence and sort of how the

17  parties viewed this for seventeen years before Northwest, they

18  viewed this as being, in substance, a lease; not legally so

19  because of the circumstances with the Bloomington liquor

20  license, but in substance, that the tenant here or the agent

21  here was to have no more powers to act for the -- you know, the

22  owner, than a tenant would bind a landlord.

23         THE COURT:  I think I understand this argument.

24         MR. GOROFF:  Okay.  Also, Capp had no control over how

25  Larken operated the hotel.

1          THE COURT:  I think I understand this branch of your

2    argument.

3          MR. GOROFF:  Okay.  There's also the statute of

4    frauds.  This is a contract to run with the land.  Mr. Eyers

5    says, well, we're not trying to enforce that, but the contract

6    says what the contract says.  And if you don't satisfy the

7    Minnesota Statute of Frauds, Your Honor, you don't have a

8    contract.  They don't satisfy the Minnesota Statute of Frauds.

9    There is no writing they can point to under which Capp Seville,

10   Inc., gave Larken any authority as to the land.  Again, Exhibit

11   B to Mr. Eyers' motion speaks only of the hotel, separately

12   defines "land," gives Larken absolutely no powers as to the

13   land.

14         They also concede it wasn't registered.  Now why is

15   that important?  Because part of why Capp brought this case is

16   that they wanted to go after La Quinta, and they threatened La

17   Quinta, and they said they had the right to do so.  But if they

18   didn't register, that demonstrates that they knew they had no

19   right to go after La Quinta, and that their action was

20   therefore tortious.

21         But they say we don't argue that anything we did was

22   justified.  That's simply untrue, Your Honor.  Larken was in

23   breach.  It had not paid us -- "us" being Capp -- $750,000, its

24   manager's or owner's amount -- is obviously a material term.

25   That was admitted by Larken to be a breach of the restated

1   management agreement.  Larken had also failed to make tax

2   payments.  That was a further breach of the agreement.  So Capp

3   went to Larken and said -- and by the way, Larken also breached

4   by exceeding the duration.  Capp confronted Larken on that, and

5   Ms. Goldston said, I'll take care of this, and then didn't.

6   Three material defaults.

7          So Capp and Larken talk, and Larken says, after 9/11,

8   we're getting out of the hotel business anyway, maybe it's

9   better if we sell this.  This is undisputed.  And because in

10  part of Larken's breaches -- this is also undisputed -- Capp

11  decides to sell.  Capp had no obligations to Northwest, it had

12  no contract with Northwest.  It has no obligation to keep on a

13  deadbeat manager, who isn't meeting its obligations because the

14  manager had contracts, any more than a landlord would have to

15  keep a tenant in place because the tenant had a contract with

16  an exterminator or a maid service.

17         And Mr. Eyers argued this reading -- the University of

18  -- Lee v. University of Minnesota case, which is 672 N.W. 2d

19  366, that, well, it doesn't make sense because how can you rent

20  rooms unless you are -- you have to be either a lessee or the

21  owner, so they must have been the agent.  Not true.  A hotel --

22  to stay in a hotel room for a night, you're not getting a

23  sublease, Your Honor.

24         THE COURT:  I understand.  You argue that it's a

25  license and that there was no corresponding obligation to take

1    rooms, this was simply a rebate, if you will.

2           MR. GOROFF:  Right.

3           THE COURT:  I think I understand.  You don't have to

4    quote from the case if the case is --

5           MR. GOROFF:  Well, he accused me of misreading the

6    case, Your Honor.  He has misread the case, Your Honor.

7           THE COURT:  All right.  Very good.  I'll take that

8    into consideration when I study your briefs.

9           MR. GOROFF:  But certainly the behavior of Larken was

10   justification which also precludes any tortious interference

11   claim.

12          Mr. Karver, who is an employee of a real estate

13   broker, and therefore nothing as to us, said in his deposition

14   that he never told Larken to get rid of Northwest, that Capp

15   never had anything to do with that.  Larken testified, and it's

16   undisputed, that it made the decision to get rid of Northwest,

17   that Capp had nothing to do with it.  And there's no evidence

18   that Capp had anything to do with it.  Capp did decide to get

19   rid of Larken early in its -- before the contract ended because

20   Larken had breached its obligations, as Larken admits.

21          Northwest made a ratification argument in its reply.

22   That argument had never been made before, and therefore is

23   waived.  There's also no ratification -- obviously, Capp at all

24   times instructed Larken that it had gone beyond its authority,

25   told Larken they should tell Northwest it had no rights as to

1  Capp, and was assured by Larken it would.

2          There's never been any acceptance of benefits, that

3  Capp got rent or monies from Northwest's contract, is true of

4  anyone who stays at the hotel.  If, passenger in Minneapolis,

5  Your Honor, you had stayed at the Clarion Hotel and had paid

6  Larken money, Capp would have gotten a percentage of that.  But

7  that didn't make Capp a contract party as to you or anyone else

8  that stayed there, even someone that stayed there often, such

9  as Northwest.

10          And if Northwest believed that it was a counter-party

11  to a contract with Capp, then why isn't Capp on the schedules,

12  Your Honor?  Those schedules were prepared before this

13  litigation, and Capp is nowhere there, and that's never been

14  answered.

15          Now let me just conclude by saying that there is a

16  party in absence here, and that is Larken.  Larken was the

17  party that dealt with Northwest.  Larken was the party that

18  promised Northwest.  Larken is the party that signed the

19  agreement.  Why aren't they suing Larken?  Well, they did.  But

20  they've come before you and they've said, well, we know Larken

21  is judgment-proof, they don't have the money.  But as part of

22  the deal to get this sale done, they know Capp put aside an

23  escrow amount, so they know that's money that's there to be

24  contested for, and they want that money.

25          Your Honor, as a matter of law, as I think we've shown

1  overwhelmingly -- and I do apologize if Your Honor thinks the

2  papers are long, but I think we needed to show all of the

3  evidence that supports our position -- Northwest has absolutely

4  no claim against us; and, as a matter of summary judgment, Your

5  Honor can only find for Capp Seville.  Thank you.

6       THE COURT:  What do you know about the document which

7  you cite, also -- you refer to their version of Exhibit I,

8  which has this writing on it, "remove."

9       MR. GOROFF:  Well, Your Honor, we were pursuing the

10  thought that this was evidence that they were trying to kind of

11  hide things, and Mr. Brandt in his deposition didn't know where

12  that came from; no one from the Larken side knew where that

13  came from.

14       Your Honor, I think as Mr. Eyers says, we all could

15  have put in additional copies of that, that didn't have that

16  "remove" sign.  We chose not to because tried not to overflow

17  the volume of paper, and because we tried to work as much as

18  possible within Mr. Eyers' exhibits.  But I agree with him that

19  I don't think it's of material significance to this summary

20  judgment motion.  And if for some reason Your Honor were to

21  rely on it, I don't think we'd have anyone at either side at

22  trial who could address it.  Certainly it had nothing to do

23  with Capp.

24       THE COURT:  No, that I understand.  He says, though,

25  that Capp wasn't a proposed party here; it was just

1    acknowledged -- to be acknowledged and consented to by the

2    hotel owner.

3        MR. GOROFF:  Well, that puts it on the hook, and

4    that's what happened in twenty instances where they had people

5    acknowledge and consent that they're bound.  And that's why, if

6    you look at Paragraph 12, it says "hotel owner, if not a party

7    hereto."  Well "if not a party hereto" suggests that they

8    become a party somehow; they become a party by signing in the

9    owner's signature line.

10        THE COURT:  All right.

11        MR. GOROFF:  Thank you, Your Honor.

12        THE COURT:  Thank you.

13        MR. EYERS:  Can I have five minutes, Your Honor?

14        THE COURT:  Certainly.

15        MR. EYERS:  Your Honor, I don't say this lightly, but

16    Mr. Goroff misrepresents the record when he suggests that Ms.

17    Goldston and Mr. Cook informed Northwest Airlines that the

18    duration of the hotel agreements would exceed their authority.

19    I'm not going to read the deposition testimony into the record.

20    It's on Pages 27 and 28 of our brief, it's set forth verbatim,

21    and it clearly establishes that Mr. Cook has no recollection of

22    any such conversation, and Ms. Goldston testified directly to

23    the contrary.

24        Mr. Goroff, with respect to the running of the land

25    provision, suggests that our abandonment of that claim is

1  somehow proof of tortious intent with respect to La Quinta.

2  Actually, Your Honor, under Minnesota law, we could have

3  pursued a claim against La Quinta because they were aware of it

4  before they took possession of the property.  We could not have

5  pursued a claim against Capp under that provision, and there is

6  no longer a claim because the property has been sold, and the

7  contracts have never been registered.

8       Mr. Goroff does raise a good question:  If, by virtue

9  of signing on behalf of the hotel, a management company is

10 binding the owner, what's the purpose of this parenthetical

11 language; why do you have this alternative scenario where the

12 owner is not a party?  And the answer is really quite simple,

13 Your Honor.

14      In the hotel world, there are three primary

15 arrangements:  There is an owner that manages the hotel itself,

16 there is an owner that hires a management company to manage the

17 hotel as its own agent, and there's a third scenario where the

18 management company actually has a lease at the hotel.  And in

19 those cases, the management company could sign on its own

20 behalf because it had a lease.  But in that situation, if the

21 contract were to run with the land, we'd need a separate

22 signature with the owner.  The signature block is consistent

23 with the language of the agreement and in no way suggests that

24 the owner cannot be the hotel.

25      Mr. Goroff also referenced some cases he said we're

1   afraid to talk about with respect to extrinsic evidence.  One

2   of those cases was the Ecolab case, Your Honor.  And what Capp

3   says is:

4           "Contrary to Northwest's argument, substantial other

5           Minnesota authority shows that it is appropriate to

6           look at the parties' negotiation history and other

7           evidence of their intent, even though their contract

8           meaning is deemed plain."

9           That's what they say.

10          What Ecolab says, Your Honor, is:

11          "When construing an ambiguous contract, the Court has

12          a duty to give effect to the intent of the parties."

13          Mr. Goroff also referenced the ICC case.  Capp quotes

14  from that case, quote:

15          "Precontract negotiations may be considered in order

16          to determine the meaning and intent of the parties."

17          This is the case where they left out what came before

18  that, Your Honor.  What ICC actually says is:

19          "Although preliminary negotiations cannot be allowed

20          to contradict of vary the plain terms of a written

21          agreement, where such contractual terms or words are

22          ambiguous or reasonably susceptible of more than one

23          meaning, precontract negotiations may be considered in

24          order to determine the intent of the parties."

25          The meaning of that quote changes a little bit when

1  it's actually fully quoted.

2          The other case Mr. Goroff cited and suggested that

3  there's a duty of inquiry even in a case with actual authority

4  was the Lee case, Your Honor.  And in Lee -- and there's two

5  different Lee cases being cited.  It's the Lee cites that he

6  cites with respect to agency.  There's no written agreement.

7  So of course the Court looked at evidence of the parties'

8  conduct and extrinsic evidence of the parties' intent when

9  trying to determine if there was a contract, and if there was,

10  what the terms of that contract were.

11          Finally, with respect to Your Honor's earlier

12  hypothetical:  What if the authority really was limited?  And

13  in an exchange with Mr. Goroff, the Court pointed out that we

14  contend that any limit really goes to damages and not the

15  actual liability.  And I believe Mr. Goroff simply

16  misinterprets the restatement, which says that a contract like

17  this is divisible, whether it's widgets or days or years, Your

18  Honor.  Where there are severable units, the contract can be

19  severed.

20          Northwest did place Capp on notice that it was willing

21  to be bound to the terms of that contract when it received

22  notice that it was being terminated by Capp.  Likewise, Your

23  Honor, Capp took no action in reliance on its belief that it

24  wasn't bound because it specifically amended the terms of the

25  sale agreement and entered into the whole stipulation escrowing

1   the sale proceedings, in order to go through with the sale of

2   the hotel.  It can't claim any detriment based on its reliance

3   on its belief that it was not bound to the terms of that

4   agreement.

5         Therefore, even if there were -- even if there were

6   some factual issue about the scope of Capp's authority, and

7   there certainly isn't any in the written agreement, Your Honor,

8   but even if there were, that would simply go to damages, and

9   Northwest would be potentially limited to the term of the

10   management agreement, rather than the full five years.  Thank

11   you, Your Honor.

12         THE COURT:  Now Paragraph 12 of the HSA is the

13   paragraph that has language and the "hotel owner," "if hotel

14   owner is not a party hereto."  That's the language that you've

15   been -- you referred to, I think, a moment ago?

16         MR. EYERS:  Yes, Your Honor.

17         THE COURT:  And that opposing counsel has already

18   referred to.

19         MR. EYERS:  Yes, Your Honor.

20         THE COURT:  Is it your position that it was proposed

21   that Capp Seville, the owner, be a party to the agreement in

22   the -- by the signature line that was left for it?

23         MR. EYERS:  I'm not sure I understand the question,

24   but let me try and respond.

25         I believe that Capp was a party to the agreement by

1  virtue of the fact that its agent signed on behalf of the

2  hotel.  There's no testimony that I'm aware of suggesting that

3  this signature block was specifically left into this agreement

4  to deal with this situation.  Instead, the testimony as I

5  understand it is that this is a template, and the reason

6  there's parentheticals speaking about contingencies such as

7  those situations where the owner is not a party is because this

8  is a template and it's designed to deal with a variety of

9  different situations.  So I hope that's responsive.  But

10  there's no suggestion that that signature block for the owner

11  was specific to this deal.

12           THE COURT:  I understand that, but that's -- the block

13  was still there when the two parties to the agreement signed

14  it.

15           MR. EYERS:  It was, Your Honor.

16           THE COURT:  And they make a big deal of that in their

17  papers.

18           MR. EYERS:  They do, Your Honor.

19           THE COURT:  And you respond to it very sparingly in

20  your papers.  But that's just my take on your papers.

21           MR. EYERS:  Sure.  Here -- and let me expand, if I

22  might then, because we did summarily address the cases they

23  cite, and the short answer is:  Not one of those cases where

24  there was an unsigned signature block dealt with an agent with

25  actual authority.  So it begs the question, if they had actual

1    authority, that's the very reason you have them sign on behalf

2    of the owner.  If they don't have authority, then it's a

3    separate issue.

4         There's no case that I'm aware of that's been cited by

5    either party where a separate signature block on behalf of a

6    principal was found to somehow alter the underlying

7    relationship between the principal and the agent, and I can't

8    imagine any legal basis for that being the case.

9         THE COURT:  Now what do you make of the sentence in

10   the same Paragraph 12 that we've been looking at that says:

11            "Hotel owner shall provide written notice to Northwest

12            and hotel not later than ten days after it has agreed

13            in writing to sell, convey, transfer, or assign any

14            interest in the hotel facility or this agreement."

15       What do you make of that sentence?  Was Capp Seville

16   bound by that obligation?

17       MR. EYERS:  Yes, sir.

18       THE COURT:  They were.

19       MR. EYERS:  Yes, sir.

20       THE COURT:  So they breached the contract when they

21   failed to provide you -- or did they provide you with notice?

22       MR. EYERS:  Well, we received notice from their agent

23   that they were selling the hotel.

24       THE COURT:  Well, that you learned.  But you say they

25   were bound by this sentence separately.

1          MR. EYERS:  Not separately, Your Honor, because it's

2     deemed in the alternative.  The previous sentence says:

3               "Whether or not hotel is in compliance with other

4               terms and conditions of this agreement, hotel shall

5               provide written notices to Northwest."

6          THE COURT:  Yes.

7          MR. EYERS:  So really, that's a redundancy, or in

8     those cases where they truly are separate parties, separate

9     requirements, it doesn't seem to change the meaning of that,

10    which is if the interest on which we are relying to secure

11    these hotel rooms is being transferred, we're entitled to

12    notice.

13         THE COURT:  All right.

14         MR. EYERS:  Thank you.

15         THE COURT:  Thank you.

16         MR. GOROFF:  I just have a couple more things, Your

17    Honor, if I may.

18         Your Honor, Mr. Eyers a couple of times has said that,

19    you know, these are just there for contingencies, such as if

20    it's a landlord, tenant, or otherwise.  Well, what do they do

21    to explore the contingencies here?  They did no due diligence,

22    they asked no questions, they did nothing to determine

23    authority.

24         Second, Your Honor asked if they are trying to treat

25    Capp as a party.  Read their amended counterclaim, they most

1   certainly they are.  They've accused us of being a party and of

2   breaching the agreement.

3        Next, Mr. Eyers begins with a heavy heart telling you

4   that I've misrepresented the record.  I don't like that, Your

5   Honor.  And, Your Honor, I would encourage you to read

6   Paragraphs 106 to 115 of our statement of facts and the

7   deposition testimony, particularly of Brad Cook and Natalie

8   Goldston quoted therein.  You'll see that Mr. Eyers is very

9   selective and extremely incomplete in his citations.

10        And finally, Your Honor, actual authority is what

11  they're going on.  Under no circumstance did Larken have actual

12  authority -- look at the restated management agreement, Your

13  Honor -- to enter into an agreement to 2009.  Their arguments

14  about blue-penciling are wrong.  But under no circumstances did

15  they have actual authority to do that.  They flagged that.  Any

16  way you look at it, they flagged that our agreement is 2009 --

17  is 2007; this is 2009.  And what did Northwest do?  Nothing.

18  It was on notice.  It did nothing to protect its rights.  It

19  has absolutely no basis for an agency claim here.

20        They didn't address the duty of inquiry, which showed

21  that that applies, including with actual authority arguments.

22  Thank you, Your Honor.

23        THE COURT:  Thank you.

24        I'll take the matter under advisement and get you a

25  decision as soon as I can.

1          MR. GOROFF:  Thank you very much, Your Honor.

2          THE COURT:  Thank you very much for excellent

3    arguments today.

4          Please go right ahead.  Don't wait for me.

5          COUNSEL:  Thank you.  Okay.  Thank you, Your Honor.

6       (Counsel confer.)

7          THE COURT:  I'll get an additional letter from the

8    debtor --

9       (Proceedings concluded at 1:37 p.m.)

10                              *****

11                         CERTIFICATION

12          I certify that the foregoing is a correct transcript

13    from the electronic sound recording of the proceedings in the

14    above-entitled matter.

15

16

17

18    _____    October 31, 2007
      Coleen Rand, AAERT Cert. No. 341
19    Certified Court Transcriptionist
      Rand Reporting & Transcription, LLC
20

21

22

23

24

25