UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Bankruptcy Court |
| | Chapter 11 |
| NORTHWEST AIRLINES CORPORATION, | Case No.: 05-17930 (ALG) |
| *et al.*, | Adv. Pro. No. 06-01446 |
| | Jointly Administered |
| Debtors. | |
| | |
| NORTHWEST AIRLINES, INC., | |
| Appellant, | CIVIL ACTION |
| -against- | No. 08-04742 (GBD) |
| CAPP SEVILLE, INC., | Hon. George B. Daniels |
| Appellee. | |

### APPELLANT NORTHWEST AIRLINES, INC.'S MEMORANDUM IN SUPPORT OF ITS APPEAL OF THE APRIL 11, 2008 ORDER AND JUDGMENT OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

# TABLE OF CONTENTS

I.     JURISDICTIONAL STATEMENT ...................................................................1

II.    STATEMENT OF ISSUES PRESENTED AND THE APPLICABLE STANDARD OF
       REVIEW ...................................................................................................1

III.   STATEMENT OF THE CASE.........................................................................1

       A.    LEGAL POSTURE.............................................................................1

       B.    SUMMARY OF ARGUMENT ................................................................2

IV.    STATEMENT OF FACTS .............................................................................4

       A.    THE HOTEL MANAGEMENT AGREEMENT ..........................................4

       B.    THE HOTEL SERVICE AGREEMENTS ..................................................6

       C.    THE SALE OF THE HOTEL..................................................................9

       D.    THE BANKRUPTCY COURT'S DECISION..............................................10

V.     ARGUMENT ...........................................................................................10

       A.    STANDARD OF REVIEW. ...................................................................10

       B.    THE BANKRUPTCY COURT ERRED IN FINDING THAT LARKEN
             LACKED AUTHORITY TO ENTER INTO THE HSAS ON CAPP'S
             BEHALF. ........................................................................................11

             1.    The Management Agreement Authorized Larken to Execute the
                   HSAs on Capp's Behalf ............................................................11

             2.    Capp Cannot Disclaim Liability For The Authorized Acts Of Its
                   Agent......................................................................................13

             3.    The Most Reasonable Interpretation is that the Limitations Clause
                   Applies Only to Service Contracts and Vendor Leases ..............16

             4.    Capp Was The "Clarion Hotel ...................................................20

             5.    The Terms Of The HSAs Do Not Change Capp's Legal Status.........22

       C.    ALTERNATIVELY, THE HSAS ARE ENFORCEABLE THROUGH
             THE TERM OF THE MANAGEMENT AGREEMENT .....................................23

VI.    CONCLUSION..........................................................................................24

5487646v1

# TABLE OF AUTHORITIES

**Cases**

Brookdale Pontiac-GMC v. Fed. Ins.,
    630 N.W.2d 5 (Minn. Ct. App. 2001) ..................................................................... 19

Brookfield Trade Center, Inc. v. County of Ramsey,
    584 NW.2d 390 (Minn. 1998) ............................................................................... 16

Capp Seville, Inc. v. Northwest Airlines, Inc. (In re Northwest Airlines Corp.),
    383 B.R. 283 (Bankr. S.D.N.Y. 2008) ............................................................. passim

Cardiac Pacemakers, Inc. v. Aspen II Holding Co.,
    413 F. Supp. 2d 1016 (D. Minn. 2006) .................................................................. 14

Derrick v. The Drolson Co.,
    69 N.W.2d 124 (Minn. 1955) .......................................................................... 11, 12

Egner v. States Realty Co.,
    26 N.W.2d 464 (Minn. 1947) ................................................................................ 16

Fingerhut Mfg. Co. v. Mack Trucks, Inc.,
    125 N.W.2d 734 (Minn. 1964) .............................................................................. 14

Hatinen v. Payne, 185 N.W. 386 (Minn. 1921) ............................................................ 12

In re Mid-City Hotel Associates,
    114 B.R. 634 (Bankr. D. Minn. 1990) ................................................................... 15

In re Perosio, 364 B.R. 868 (N.D.N.Y. 2006) .............................................................. 10

Jurek v. Thompson, 241 N.W.2d 788 (Minn. 1976) ..................................................... 14

Lee v. Peoples Co-op. Sales Agency,
    276 N.W. 214 (Minn. 1937) .................................................................................. 14

Lee v. Regents of the Univ. of Minn.,
    672 N.W.2d 366 (Minn. Ct. App. 2003) ................................................................ 15

Mikulay v. Home Indem. Co.,
    449 N.W.2d 464 (Minn. Ct. App. 1989) ................................................................ 14

Quinlivan v. Emcasco Ins. Co.,
    414 N.W.2d 494 (Minn. Ct. App. 1987) ................................................................ 11

Thomas v. Joslyn,
    15 N.W. 675 (1883) ........................................................................................... 23

Tullis v. Federated Mut. Ins. Co.,
    570 N.W.2d 309 (Minn. 1997) ........................................................................ 14

Urban v. Am. Legion Dept. of Minn.,
    723 N.W.2d 1 (Minn. 2006) ............................................................................ 20

Vacura v. Haar's Equip. Inc.,
    364 N.W.2d 387 (Minn. 1985) ........................................................................ 14

Wilhelm Lubrication Co. v. Brattrud,
    268 N.W. 634 (Minn. 1936) ............................................................................ 23

Woolley v. Embassy Suites, Inc.,
    227 Cal.App.3d 1520 (1991) .......................................................................... 13

**Federal Statutes and Rules**

28 U.S.C. § 158 ................................................................................................... 1, 10

FED. R. CIV. P. 56 .................................................................................................. 10
FED. R. BANKR. P. 7056 ....................................................................................... 10

**Other Authorities**

RESTATEMENT OF AGENCY (Second) § 1(1) (2004) ...................................................... 20
RESTATEMENT OF AGENCY (Third) § 1.01 (2006) ....................................................... 20

## I.  JURISDICTIONAL STATEMENT

On April 21, 2008, Debtor Northwest Airlines, Inc. ("Northwest") filed a timely notice of appeal from the April 11, 2008 judgment of the Bankruptcy Court for the Southern District of New York in the above-captioned adversary proceeding.  This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 158(a).

## II.  STATEMENT OF ISSUES PRESENTED AND THE APPLICABLE STANDARD OF REVIEW

- Whether a hotel owner can authorize its managing agent for the hotel to rent rooms to third parties and, at the same time, prohibit its agent from entering into *any* agreement that binds the owner.

    The Bankruptcy Court held that a hotel owner can appoint a managing agent to rent hotel rooms to the public while disclaiming all liability for its agent's actions.

    Standard of Review:   de novo

## III.    STATEMENT OF THE CASE

**A.    Legal Posture**

Capp Seville, Inc. ("Capp"), the former owner of the Clarion Hotel ("Hotel"), brought the underlying adversary proceeding against Northwest seeking, among other things, a declaration that it was not a party to, and therefore was not liable for the breach of, two long-term hotel contracts ("HSAs") between Northwest and the Hotel.  Capp's managing agent for the Hotel, Larken, Inc. ("Larken"), executed the HSAs as "authorized agent for" and "authorized representative" of the Hotel.  Northwest counterclaimed, asserting breach of contract based upon Larken's actions as Capp's agent with actual or apparent authority.  In addition to the actual authority granted Larken under the management agreement ("Management Agreement") between Capp and Larken, Northwest asserted that Capp ratified the HSAs when it learned of their terms and knowingly accepted Northwest's payments for two years before changing its position because it wanted to sell the Hotel.  Alternatively, in the event that Capp was

determined not to be a party to the HSAs, Northwest asserted that Capp tortiously interfered with the HSAs by directing Larken to terminate them.

Northwest and Capp both moved for summary judgment. Northwest sought judgment that Capp is liable for the undisputed breach of the HSAs based on Larken's actual authority to execute them on Capp's behalf. Capp sought judgment that Larken lacked authority to sign the HSAs on Capp's behalf, and hence, Capp is not liable. The Bankruptcy Court concluded, as a matter of law: that Larken lacked actual or apparent authority to bind Capp to the terms of the HSAs; that Northwest's claim against Capp for ratification was barred by the statute of frauds; and that Capp was justified to the extent it interfered with the HSAs. Capp Seville, Inc. v. Northwest Airlines, Inc. (In re Northwest Airlines Corp.), 383 B.R. 283 (Bankr. S.D.N.Y. 2008). The Bankruptcy Court granted Capp's motion, denied Northwest's motion, and entered judgment for Capp under rule 54(b) of the Federal Rules of Civil Procedure. Northwest appeals that Judgment.

**B.      Summary of Argument**

The central issue in this lawsuit and this appeal is whether Larken, the "managing agent" of Capp's hotel, acted with authority when it entered into two long-term contracts with Northwest for the rental of hotel rooms. The Bankruptcy Court concluded that Larken acted as Capp's managing agent in operating the hotel, and that Capp authorized Larken to rent rooms to Northwest and other members of the public. The Bankruptcy Court also concluded, however, that Larken lacked authority to enter into the HSAs because it interpreted certain limiting language in the Management Agreement as prohibiting Larken from entering into any contracts with a duration beyond the term of the Management Agreement and from entering into any contracts that imposed liability on Capp.

The core question raised by the Bankruptcy Court's decision is whether a hotel owner can authorize its managing agent for the hotel to rent rooms and, at the same time, prohibit its agent from entering into *any* agreement that binds the owner. The Bankruptcy Court erred when it answered this question affirmatively. A basic tenet of agency law is that an agent must have authority to bind the principal when acting on its behalf. A necessary corollary of this tenet is that a principal cannot prohibit its agent from imposing liability on the principal when the agent is otherwise acting within its authority. Either the agent has authority to act on behalf of its principal or it does not.

The Management Agreement expressly authorizes Larken to act as Capp's agent for renting hotel rooms to the public. If the Bankruptcy Court's interpretation of the Management Agreement is correct, the effect would be to withdraw that authority, and the entire agreement would be invalid because Larken would be an agent without authority to act on behalf of its principal. This interpretation leads to an absurd practical result and, therefore, should not be followed. Instead, the Management Agreement should be construed according to its plain language and to give meaning to its apparent purpose. The limiting language should be confined the section of the Management Agreement in which it is contained, the section pertaining to contracts and leases with service vendors for the Hotel and not contracts for the rental of hotel rooms.

The Bankruptcy Court's interpretation also creates a dangerous legal precedent. If a principal is allowed to authorize its agent to enter into transactions on its behalf, yet disclaim its liability by including a limitation that eliminates the agent's authority to bind the principal, all principals would begin to do so. It is the ideal situation for the principal, who would be able to

enforce a contract when it is favorable to do so, but avoid liability when its agent breaches the same contract.

The Management Agreement authorized Larken to enter into room rental contracts with Northwest on Capp's behalf, and the limiting languages was not intended by Larken or Capp to prevent such agreements. This Court should interpret the Management Agreement in a way that preserves its obvious purpose and reverse the Bankruptcy Court's finding that Larken lacked actual authority to enter into the HSAs.

## IV.    STATEMENT OF FACTS

### A.    The Hotel Management Agreement

Capp was, at all relevant times, the owner of the Hotel, which is located in Bloomington, Minnesota. (NW Dkt.[1] #8, at SMF 1.) In 1988, Capp and Larken entered into a Restated Hotel Management Agreement (the "Management Agreement"), which, by its terms, is governed by Minnesota law. (Id. at SMF 4.) Throughout the Management Agreement, including its amendments, Capp is referred to as "Owner" and Larken is referred to as "Manager." (See generally NW Dkt #9 Exs. B-F.) Capp acknowledges that the Management Agreement does not provide Larken with any property interest in the Hotel. (Id. at SMF 10; NW Dkt. #9 Ex. B, at 37, ¶ 20.)

The Recitals section of the Management Agreement states:

Owner is the owner of land and improvements thereon located in Bloomington, Minnesota, operated as the Best Western Seville Hotel.[2]
. . .

---

[1]    "NW Dkt." refers to Northwest's Designation of Items to Be Included in Record on Appeal.

[2]    Capp later ended its franchise relationship with Best Western, and the Hotel was operated from that time forward as the Clarion Hotel.

> Owner and Manager . . .  desire to engage Manager as manager of the hotel under this Agreement in order to confirm the owner/manager relationship under the Best Western, International, Inc., bylaws.

(NW Dkt #9 Ex. B, at 1.)  "Hotel" is defined in the agreement as "[t]he hotel operated on the Property from time to time under this Agreement."  (Id. at 2.)

The "Engagement" section of the Management Agreement provides that Capp "engages [Larken] as the sole and exclusive managing agent for the Hotel, authorized to supervise and direct the management and operation of the Hotel on the terms of this Agreement and for the consideration provided in this Agreement."  (NW Dkt. #9 Ex. B, at 5, ¶ 2.)  Larken "accept[ed] this engagement and agree[d] that it w[ould] supervise and direct the management and operation of the Hotel, all pursuant to the terms of th[e] Agreement."  (Id.)

Section 5 of the Management Agreement lays out the Manager's Obligations.  Paragraph 5(a) requires Larken to "operate the Property as a hotel . . . which operation includes without limitation the rental of rooms . . . [and] all activities in connection therewith which are customary and usual to such operation."  (NW Dkt. #9, Ex. B, at 12-13, ¶ 5(a).)

Paragraph 5(e), entitled Contracts and Leases, states in full:

> Manager agrees, in connection with its management of the Hotel under this Agreement, to carry out Owner's obligations under the service contracts and space leases in effect as of the date hereof and described on Exhibit B attached hereto and the Best Western Agreement (the "Contracts and Leases").  Owner agrees to indemnify Manager against [] losses, claims, liability or expenses arising out of the Contracts and Leases and obligations or events thereunder accruing or occurring before the first day of the Term.  Manager may terminate and replace the Contracts and Leases (other than the Best Western Agreement) in accordance with their terms and the then Annual Plan in connection with its ordinary course operation of the Hotel.  Manager shall indemnify Owner from any liability, expenses claims arising out of any breach for non-payment or otherwise or for any unlawful termination and replacement of any of the Contracts and Leases.  *In entering into service, maintenance, and other contracts and leases in addition to the Contracts and Leases, [Larken] agrees that: (i) no such contracts and leases shall extend beyond the Term of this Agreement unless they are terminable at the end of the*

> *Term, (ii) all such contracts and leases shall be in Manager's name and shall not impose liability on Owner unless assumed by Owner* and  (iii) Manager shall keep in effect service contracts on special Hotel equipment such as televisions, telephones, computers and elevators unless Manager customarily provides such service itself or unless Owner reasonably agrees otherwise.

(NW Dkt. #9, Ex. B, at 12-13, ¶ 5(e).)  (emphasis added—the "Limitations Clause.").  Although copies of the Management Agreement produced by Capp and Larken did not include Exhibit B, which this paragraph referenced in connection with the defined term "Contracts and Leases," the prior management agreement between Capp and Larken (which is referred to in the Management Agreement) contained an identical paragraph and Exhibit B.  (NW Dkt. #9, Ex. A, at 17, ¶ 5(e) & "Exhibit B.")  This Exhibit B confirms that the entire paragraph refers to vendor contracts for services such as telephones, movie channels, elevators, advertising, rubbish and pest removal. (Id. at Ex. B.)  There is no reference to room reservations or other guest contracts.  (Id.)

Through a series of amendments, Capp and Larken modified and/or extended the Management Agreement several times.  (NW Dkt. #8, at SMF 5-8; NW Dkt. #9, Exs. C-F.)  Under the Management Agreement and its amendments, Capp was to receive 20% -25% of the Hotel's gross room receipts.  (NW Dkt #9 Exs. B-F.)  The final amendment extended the Management Agreement through December 31, 2007.  (NW Dkt. #9, Ex. F, at 1.)

## B.    The Hotel Service Agreements

During the summer of 2004, Northwest issued a request for proposal for a long-term hotel contract to provide lodging for its employees.  (NW Dkt. #8, at SMF 13.)  Larken responded to this request on behalf of the Hotel as its "Management Company."  (Id. at SMF 14.)  Northwest and Larken subsequently entered into negotiations and ultimately came to terms on the two HSAs.  (Id. at SMF 15.)  Natalie Goldston, the general manager of the Hotel and a Larken employee, negotiated the terms of the HSAs with Northwest.  (Id. at SMF 16.)  Both HSAs have five-year terms that expire on August 20, 2009.  (NW Dkt. #9, Exs. I & J, at 10.)

5487646v1

6

Neither HSA includes any provision permitting Capp or Larken to terminate the agreement prior to its expiration date due to the sale of the Hotel or for any other reason absent a default by Northwest.  (NW Dkt. # 9, Exs. I & J.)

The parties negotiated the HSAs based upon a template that Northwest used with numerous other hotels.  (NW Dkt. #12, at SMF 10.)  As Capp acknowledges, the template was designed to accommodate a variety of hotel ownership situations because, in Northwest's experience, "every hotel ownership deal is different."  (Id. at SMF 15-16.)  Accordingly, the template includes several terms and a signature block applicable to those situations where a separate signature from the owner is necessary – i.e., in some circumstances where a hotel is being leased from the owner rather than managed on behalf of the owner and separate consent is required.  (See NW Dkt. #9, Exs. I & J, at 9.)

The template also includes a single paragraph with language applicable to those situations where the hotel owner is not a party.  (NW Dkt. #9, Exs. I & J, at 5.)  Paragraph 12 provides that:

> The parties (and the Hotel owner, if the Hotel owner is not a party hereto) expressly agree that this Agreement shall run with the land.  This Agreement shall be binding on all successors and assigns of the parties (and the Hotel owner, if the Hotel owner is not a party hereto) whether or not such successor or assign acquires by contract, merger, purchase of assets or operation of law.  . . . Hotel shall provide written notice to Northwest and Hotel owner not later than ten (10) days after it has agreed in writing to sell, convey, transfer or assign any interest in the Hotel facility or this Agreement.  Hotel owner shall provide written notice to Northwest and Hotel not later than ten (10) days after it has agreed in writing to sell, convey, transfer or assign any interest in the Hotel facility or this Agreement.

(Id.)  The template included signature blocks for Northwest and the Hotel, and a separate signature block for the "Hotel Owner" to "acknowledge[] and consent[]" to the terms of the agreement in those situations where the owner is not a party.  (Id. at 9.)  Neither Paragraph 12 nor the separate "acknowledge and consent" signature block for the Hotel owner was removed from the final version of the HSAs.  (Id.; NW Dkt. #11, at 32.)

Both HSAs have substantially identical clauses identifying the parties to those

agreements.  The first paragraph of each agreement provides:

> THIS AGREEMENT is entered into … between [Northwest] and the Clarion
> Hotel ("Hotel") on behalf of, and as authorized agent for, the Hotels listed on
> Appendix A for the purposes of setting forth the terms and conditions for the
> accommodation of Northwest flight crews and other employees and contractors
> ("Northwest Guests").

(NW Dkt. #9, Exs. I & J, at 1.)

Capp admits that, based upon these terms, "the party that signs for the 'Hotel' has to be

authorized as agent for the Hotel."  (NW Dkt. #11, at 18.)  Capp also admits that the

Management Agreement "makes Larken the agent for the 'hotel.'"  (NW Dkt. #11, at 37.)  The

HSAs were executed by Larken employees as "Director of Operations" for "The Clarion Hotel."

(NW Dkt. #9 Ex. I, at 9; Ex. J, at 9.)  Neither of the HSAs includes any reference to Larken.

(NW Dkt. #9 Exs. I & J.)  "The Clarion Hotel" was not, and never has been, a separate legal

entity.  (NW Dkt. #8, at SMF 19.)

In response to written discovery, Larken: admitted "that it did not inform Northwest of

any limitation on Larken's authority to enter into the HSAs or any other contract because no such

limitation existed;" denied that it "lacked authority from Capp to enter into the HSAs on behalf

of, and as agent for, the Hotel;" and affirmatively stated that it "had authority to enter into

contracts as manager and operator of the Hotel under the Management Agreement."  (NW Dkt.

#16 Ex. Z, at ¶¶ 14-15.)  Capp similarly admitted that it "understood the Management

Agreement to authorize Larken to provide hotel accommodations and related services to third

parties at the Hotel."  (NW Dkt. #16, Ex. AA, at ¶ 3.)  There is no evidence that Capp required or

expected Larken to seek its consent to enter into room rental contracts with hotel guests.

Capp was aware that Larken was engaged in negotiating the HSAs with Northwest before they were signed.  (NW Dkt #14 Ex. 16, at 100:20-101:25, 165:4-18.)  Capp received an executed copy of one of the HSAs in February 2005.  (NW Dkt #16 Ex. R.)  Neither Capp nor Larken informed Northwest of any issue with Larken's authority to enter into the HSAs until 2006, after Capp had a buyer for the Hotel that refused to accept the HSAs as part of the sale.  (NW Dkt #14 Ex. 16, at 144:2-145:3, Ex. 20, at 49:11-14, & Ex. 18, at 123:9-12.)  The parties performed under the terms of the HSAs for nearly two years.  (NW Dkt. #8, at SMF 21.)  Northwest was the Hotel's "top account with over 40,000 room nights per year and approximately [$]2,000,000 in revenue a year."  (NW Dkt. #8, at SMF 22.)  Capp received a portion of these receipts as the Hotel's owner.  (NW Dkt #9 Ex. F, at 2.)

## C.    The Sale of the Hotel.

In June 2006, Larken notified Northwest that the HSAs were being prematurely terminated due to Capp's pending sale of the Hotel to La Quinta.  (NW Dkt. #9, Ex. T.)  When Capp sold the Hotel to La Quinta, it sold "the buildings, structures, improvements and fixtures now situated on the Land, and consisting generally, of a 'Clarion' hotel located at 5151 American Boulevard."  (NW Dkt. #16, Ex. F, at 1-2.)  Capp also sold to La Quinta the ongoing business and other intangible assets associated with the Hotel's business, including (1) service and vendor contracts that Larken entered into on behalf of the "Clarion Hotel"; (2) personal property and inventory that Larken purchased for the Hotel; (3) all existing room reservations and deposits; (4) "any and all good will and other intangible personal property used or associated with the Hotel"; and (5) "all of the business, rights, claims and assets . . . used, held for use, or acquired or developed for use in connection with the Hotel."  (Id. at 2-3.)  Capp sold these assets (including the contracts executed by Larken on behalf of the Hotel) to La Quinta in its own name

without having received any prior assignment from Larken.  (NW Dkt. #14, Ex. 1, at 137:19-23;

NW Dkt. #16, Ex. A, at 26:13-16.)

**D.    The Bankruptcy Court's Decision.**

In its summary judgment ruling, the Bankruptcy Court found that the terms of the

Management Agreement were clear and unambiguous and that the issue of Larken's authority to

bind Capp could therefore be decided as a matter of law.  Capp, 383 B.R. at 296.  The

Bankruptcy Court then concluded that, based upon the terms of the Management Agreement,

Larken lacked actual authority to bind Capp to the HSAs:

> Even if the Management Agreement permitted Larken to act as Capp's agent
> under certain circumstances, it expressly denied Larken the authority to enter into
> a contract with the terms contained in the HSAs.  It does not follow that the right
> to engage in the "rental of rooms" in a hotel necessarily encompasses long-term
> agreements that commit a party to make large blocks of hotel rooms available for
> five years at highly preferential rates and terms.  In any event, Larken lacked the
> actual authority under the Management Agreement to bind Capp to the terms of
> the HSAs.  The HSAs extended beyond the term of the Management Agreement
> and were not terminable at the end of its term.  As noted above, "an agent must
> have authority to bind the principal when acting on the principal's behalf."
> Larken did not have that authority.  It also did not have actual authority to
> "impose liability on Owner."

Id. at 293 (citation omitted).

## V.  ARGUMENT

**A.    Standard of Review.**

This Court's jurisdiction to hear this appeal derives from 28 U.S.C. § 158(a).  This Court

reviews a Bankruptcy Court's decision to both grant and deny summary judgment de novo.  In re

Perosio, 364 B.R. 868, 871 (N.D.N.Y. 2006).  Federal Rule of Civil Procedure 56 is applicable to

adversary proceedings in the Bankruptcy Court.  See FED. R. BANKR. P. 7056.  Summary

judgment is appropriate if "there is no genuine issue as to any material fact and [if] the moving

party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).

**B.    The Bankruptcy Court Erred in Finding that Larken Lacked Authority to Enter Into the HSAs on Capp's Behalf.**

The Bankruptcy Court erred in concluding that Larken lacked authority to execute the HSAs on Capp's behalf.  While the Bankruptcy Court concluded that Larken acted as Capp's managing agent in operating the Hotel and that Capp authorized Larken to rent rooms to Northwest and other members of the public, it also concluded that Larken lacked authority to impose liability upon Capp.  Capp, 383 B.R. at 293.  This conclusion turns agency law upside down.  How can a principal authorize its agent to enter into contracts on the principal's behalf and at the same time prohibit the agent from imposing liability on the principal?

The Management Agreement authorized Larken to enter into the HSAs on Capp's behalf.  The limiting language in section 5(e) was not intended to limit Larken's authority with respect to room contracts.  To reach a contrary conclusion leads to an absurd result, both factually and legally.

      1.    The Management Agreement Authorized Larken to Execute the HSAs on Capp's Behalf.

Where the existence of an agency relationship depends upon undisputed facts or the interpretation of an unambiguous contract, the issue can properly be resolved as a matter of law.  See Derrick v. The Drolson Co., 69 N.W.2d 124, 129 (Minn. 1955); Quinlivan v. Emcasco Ins. Co., 414 N.W.2d 494, 498 (Minn. Ct. App. 1987).  This case involves the interpretation of an unambiguous contract—the Management Agreement.

The Management Agreement clearly establishes that Capp granted Larken broad authority to operate the Hotel:

> Owner [Capp], having full right and power to enter into this Agreement for the full term and upon all conditions herein contained, hereby engages Manager [Larken] as the *sole and exclusive managing agent* for the Hotel, authorized to supervise and direct the management and operation of the Hotel on the terms of this Agreement and for the consideration provided in this Agreement.  Manager

hereby accepts this engagement and agrees that it will supervise and direct the management and operation of the Hotel, all pursuant to the terms of this Agreement.

(NW Dkt. #9 Ex. B, at 5 (emphasis added).)  Consistent with these terms, Capp concedes that "[t]he [Management Agreement] makes Larken the agent for the 'hotel,'" and "authorize[d] Larken to provide hotel accommodations and related services to third parties at the Hotel."  (NW Dkt. #11, at 18; NW Dkt. #16, Ex. AA, at ¶3.)  Consistent with the terms of the HSAs, Capp admits that "the party that signs for the 'Hotel' has to be authorized as agent for the Hotel." (NW Dkt. #11, at 18.)

The Management Agreement expressly authorizes Larken to enter into contracts for the rental of hotel rooms:  "Manager agrees to operate the Property as a hotel … which operation includes without limitation the rental of rooms."  (NW Dkt #9 Ex. B, at 12.)  Even without this express statement of authority to rent hotel rooms, Larken had actual authority to enter into the HSAs as Capp's "sole and exclusive managing agent for the Hotel."

The Minnesota Supreme Court has explained that the term "managing agent" imparts more than "ordinary" agency authority:

> In view of the connection in which the term "managing agent" is used, we think the legislature intended thereby only those agents who possess powers similar in character and importance to those possessed by the officers expressly named; that they intended only those agents who have charge and control of the business activities of the corporation or of some branch or department thereof, and who, in respect to the matters entrusted to them, are vested with powers requiring the exercise of an independent judgment and discretion.

Derrick, 69 N.W.2d at 128 (quoting Hatinen v. Payne, 185 N.W. 386, 387 (Minn. 1921)).

The Bankruptcy Court attempted to distinguish the Derrick decision because it involved a question of whether an individual was a managing agent and therefore authorized to receive service of process.  Capp, 383 B.R. at 293.  This distinction is immaterial with respect to the

Supreme Court's statement as to the scope of authority of a managing agent. Indeed, "[t]he very nature of a managerial relation is to delegate authority from principal to agent. A manager normally has the widest authority of all business agents and, unless limited by instructions, is in complete control of its operations." Woolley v. Embassy Suites, Inc., 227 Cal.App.3d 1520, 1531 (1991) (quotations omitted). Accordingly, as Capp's "sole and exclusive managing agent for the Hotel," Larken had actual authority to enter into contracts to rent rooms at the Hotel. The only real issue then with respect to Larken's authority to execute the HSAs is whether the Limitations Clause in the paragraph applicable to service and vendor contracts also applies to contracts for the rental of hotel rooms.

> 2. <u>Capp Cannot Disclaim Liability For The Authorized Acts Of Its Agent</u>.

The Bankruptcy Court concluded that the "Management Agreement is clear and unambiguous" and that "the intent of the Management Agreement was to vest management of the Hotel in Larken (and this does include renting rooms)." Capp, 383 B.R. at 293. At the same time, it concluded that Larken "did not have actual authority to 'impose liability on Owner.'" Id. This ruling results in a legal fiction—an agent expressly authorized to enter into transactions on behalf of its principal, but no authority to bind its principal to those transactions. Minnesota law provides that an agent acting within the scope of its authority necessarily has authority to bind its principal. The Bankruptcy Court erred in concluding otherwise.

The language in the Limitations Clause relied upon by the Bankruptcy Court in support of its conclusion states that "all such contracts and leases shall be in Manager's name and shall not impose liability on Owner unless assumed by Owner." By applying this limitation to hotel room contracts, the Bankruptcy Court seems to have concluded that, through creative drafting, Capp was able to engage Larken as its managing agent for the Hotel, expressly grant

Larken authority to rent rooms at the Hotel, and, at the same time, disclaim any liability for the acts of its managing agent.  But this ignores the fact that Larken had no authority to rent rooms in Capp's hotel other than as Capp's managing agent for the Hotel.  Authorized acts by an agent *necessarily* impose liability on the principal.  <u>Fingerhut Mfg. Co. v. Mack Trucks, Inc.</u>, 125 N.W.2d 734, 737 (Minn. 1964).

> A federal court in Minnesota recently reviewed the law of agency and explained that:

> Minnesota courts have held that an agent must have authority to bind the principal when acting on the principal's behalf.  <u>Tullis v. Federated Mut. Ins. Co.</u>, 570 N.W.2d 309, 313 (Minn. 1997); <u>Vacura v. Haar's Equip. Inc.</u>, 364 N.W.2d 387, 391 (Minn. 1985); <u>Jurek v. Thompson</u>, 308 Minn. 191, 241 N.W.2d 788, 791 (1976); <u>Lee v. Peoples Co-op. Sales Agency</u>, 201 Minn. 266, 276 N.W. 214, 216-17 (1937); <u>Mikulay v. Home Indem. Co.</u>, 449 N.W.2d 464, 467 (Minn. App. 1989), <u>review denied</u> (Minn. Feb. 21, 1990).

<u>Cardiac Pacemakers, Inc. v. Aspen II Holding Co.</u>, 413 F. Supp. 2d 1016, 1025 (D. Minn. 2006).  The necessary corollary to this tenet is that a principal cannot disclaim an agent's authority when it has granted the agent authority to act on its behalf.[3]  Thus, under Minnesota law, while the authority of an agent may be limited by the principal, the principal cannot eliminate or disclaim liability for authorized acts.  <u>See</u> <u>Fingerhut Mfg. Co.</u>, 125 N.W.2d at 737 ("Of course, where the agent acts within the scope of his authority, express or implied, his principal is bound thereby.").

In <u>Cardiac Pacemakers</u>, the court concluded that a purported agent's lack of authority to bind a principal necessarily meant that there was no agency relationship.  <u>Cardiac Pacemakers</u>, 413 F. Supp. 2d at 1025.  In this case, however, the Management Agreement confirms that Larken was Capp's managing agent for the Hotel, Capp admits that Larken was the agent of the

---

[3]    The Bankruptcy Court tacitly acknowledged this principle when it cited <u>Cardiac Pacemakers</u> for the proposition that an agent must have authority to act on the principal's behalf.  <u>Capp</u>, 383 B.R. at 292.

Hotel, and it is undisputed that Larken had express authority to rent hotel rooms under the terms of the Management Agreement.  Larken, therefore, necessarily had authority to bind Capp when it entered into agreements pursuant to this authority.  Id.

The Bankruptcy Court's conclusion that the Management Agreement prohibited Larken from entering into contracts that imposed any liability on Capp simply cannot be reconciled with the Court's conclusion that Larken was authorized to rent rooms on Capp's behalf.  If Larken truly lacked any authority to impose liability on Capp, then Larken lacked authority to accept any reservations or rent any rooms at the Hotel.  The legal effect of renting a hotel room is to grant a license for the use of the property.  In re Mid-City Hotel Associates, 114 B.R. 634, 640-41 (Bankr. D. Minn. 1990).  Only a party with an interest in the land can grant licenses for others to use it.  C.f. Lee v. Regents of the Univ. of Minn., 672 N.W.2d 366, 373 (Minn. Ct. App. 2003) (explaining that only a party with an interest in land can lease the land).  Because Larken had no property interest in the Hotel, it was legally incapable of renting hotel rooms and granting hotel licenses in its own name or on its own behalf.  Instead, it performed these functions as Capp's managing agent, and therefore, necessarily imposed liability upon Capp.

Capp cannot, consistent with the principles of agency law, disclaim liability for the expressly authorized acts of its managing agent.  To suggest otherwise would turn the law of agency upside down by allowing principals to authorize agents to enter into contracts on their behalf and, at the same time, disclaim any responsibility or liability for those contracts. Principals like Capp would be able to obtain the benefits these contracts when it is in their interest to do so (in this case, "over 40,000 room nights per year and approximately [$]2,000,000 in revenue a year), but reserve the right to walk away from these obligations whenever they chose to do so (in this case, when Capp decided to sell the Hotel).  Third parties like Northwest

would be left without recourse whenever a principal chose to abandon its obligations and disclaim liability for the authorized acts of its agent. The law of agency forbids this result.

Moreover, the Limitations Clause requires that Larken only enter into "such contracts" in its own name. Again, Larken had no property interest in the Hotel, so it had no ability to enter into room contracts in its own name. On the other hand, Larken could, consistent with this limitation and its management of the Hotel, enter into service contracts for telephone, trash, and television services in its own name without imposing liability on Capp. The impossibility of Larken entering into room contracts in its own name demonstrates that the parties never intended the Limitations Clause to apply to room contracts. And the fact that Larken signed the HSAs as "authorized agent for" and "authorized representative" of the Hotel rather than in its own name further demonstrates that the Limitations Clause has nothing to do with Larken's authority to execute the HSAs as Capp's managing agent for the Hotel. Because the Management Agreement expressly granted Larken authority to rent rooms at Capp's hotel, the Limitations Clause cannot be construed to negate that authority.

    3.    The Most Reasonable Interpretation is that the Limitations Clause
               Applies Only to Service Contracts and Vendor Leases.

Well-established rules of contract construction also preclude application of the Limitations Clause to contracts for the rental of hotel rooms. The Minnesota Supreme Court has explained that "[u]nless required by the contract as a whole, no construction of a subsidiary provision is permissible which runs counter to and is in frustration of the dominant purpose of the contract." Egner v. States Realty Co., 26 N.W.2d 464, 470 (Minn. 1947). Courts should also interpret contracts to avoid harsh and absurd results, and "in such a way as to give meaning to all its provisions." Brookfield Trade Center, Inc. v. County of Ramsey, 584 NW.2d 390, 394 (Minn. 1998) (citations omitted).

If Larken lacked authority to impose liability on Capp, then Larken was a managing agent with no agency powers or authority to bind its principal. Following this logic, Larken was only authorized to accept reservations or enter into any other hotel room contracts if it obtained Capp's consent. Thus, under the Bankruptcy Court's interpretation, Larken would have been required to seek Capp's consent every time a guest made a reservation or walked through the hotel door and requested a room. Not even Capp contends that this was a requirement or a practice. And, if the durational limitation were to apply, Larken would have been prohibited from taking any room reservations past December 31, 2007, and required to turn over to Capp a completely vacant hotel upon expiration of the Management Agreement. The Bankruptcy Court's interpretation of the Limitations Clause is, therefore, contrary to the primary purpose of the Management Agreement, conflicts with other terms of that agreement, and leads to irrational results.

In contrast, if the Limitations Clause is limited to the subject matter of the paragraph in which it appears, vendor contracts and leases with entities providing service functions to the Hotel, the Management Agreement's primary function, i.e., managing the Hotel and renting rooms, remains intact, the entire agreement is harmonized, and none of the terms is invalidated or rendered superfluous. Properly construed, the unambiguous terms of the Management Agreement establish that Larken, as Capp's "sole and exclusive managing agent for the Hotel," had authority to enter into the HSAs on Capp's behalf.

Moreover, the plain language of the Management Agreement, properly construed, demonstrates that Capp did not restrict Larken's authority to rent hotel rooms or enter into hotel room contracts, and the contractual language relied upon by the Bankruptcy Court could not have applied to the HSAs.

The Bankruptcy Court based its conclusion on the Limitations Clause, which is included in a paragraph that reads as follows:

> Manager agrees, in connection with its management of the Hotel under this Agreement, to carry out Owner's obligations under the service contracts and space leases in effect as of the date hereof and described on Exhibit B attached hereto and the Best Western Agreement (the "Contracts and Leases"). Owner agrees to indemnify Manager against [] losses, claims, liability or expenses arising out of the Contracts and Leases and obligations or events thereunder accruing or occurring before the first day of the Term. Manager may terminate and replace the Contracts and Leases (other than the Best Western Agreement) in accordance with their terms and the then Annual Plan in connection with its ordinary course operation of the Hotel. Manager shall indemnify Owner from any liability, expenses claims arising out of any breach for non-payment or otherwise or for any unlawful termination and replacement of any of the Contracts and Leases. In entering into service, maintenance and other contracts and into leases in replacement of or in addition to the Contracts and Leases, Manager agrees that (i) *no such contracts and leases shall extend beyond the Term of this Agreement unless they are terminable at the end of the Term, (ii) all such contracts and leases shall be in Manager's name and shall not impose liability on Owner unless assumed by Owner* and (iii) Manager shall keep in effect service contracts on special Hotel equipment such as televisions, telephones, computers and elevators unless Manager customarily provides such service itself or unless Owner reasonably agrees otherwise.

(NW Dkt. #9, Ex. B, at 15 (emphasis added)). Based solely upon this Limitations Clause, the Bankruptcy Court concluded that Larken lacked actual authority to bind Capp to the terms of the HSAs because "[t]he HSAs extended beyond the term of the Management Agreement and were not terminable upon its term" and because Larken "did not have actual authority to 'impose liability on Owner.'" Capp, 383 B.R. at 293.

The Bankruptcy Court erred as a matter of law in concluding that these terms applied to contracts for the rental of hotel rooms. The express terms of the Management Agreement, read together and in their entirety, make it clear that the Limitations Clause applies only to the subject matter of the paragraph in which it is included—contracts and leases with service vendors and providers to the Hotel. The Limitations Clause is confined to a single paragraph dealing with

Larken's agreement "to carry out [Capp's] obligations under various service contracts and space leases in effect as of the date of the agreement." Contracts for the rental of rooms are not even mentioned in the Limitations Clause. Instead, Larken's authority to "rent rooms" is addressed in the "Hotel Use" clause, which contains no limitation on Larken's authority to rent rooms.

The Bankruptcy Court concluded that the Limitations Clause applied to the hotel room contracts because of the following italicized language: "[i]n entering into service, maintenance and *other* contracts and into leases in replacement of or *in addition to* the Contracts and Leases. . . ." Capp, 383 B.R. at 294 (emphasis added). But "[i]n interpreting contracts, [Minnesota courts] apply the principal of *ejusdem generis*, which states that general words are construed to be restricted in their meaning by preceding particular words." Brookdale Pontiac-GMC v. Fed. Ins., 630 N.W.2d 5, 10 (Minn. Ct. App. 2001) (quotations omitted). Accordingly, the two general phrases "other contracts" and "in addition to" are both limited by the particular defined term "Contracts and Leases," which refers to "service contracts and space leases" of the type listed in Exhibit B to the Management Agreement.[4] Thus, if Larken wished to enter into a new type of service contract that Capp did not previously utilize (e.g., valet services or "on demand" television movies), the "other contracts" and "in addition to" language would trigger the Limitations Clause. Had Capp and Larken intended any other result, the Limitations Clause would have simply began with "When entering into *any* contracts . . . ." Instead, the parties chose to confine the Limitations

---

[4]     The fifteen separate contracts listed in Exhibit B further clarify the intended purpose of the Limitations Clause—"Telephones," "Computer," Software and Hardware Maint.," "T.V.'s," "Movie channels," "Elevators," "Engineers contract," "Rubbish," "Pest Control," "Game Machines," "Airport advertising," "National Cash Register," "Telecheck," "Postage Meter Rental," and "Mobile communication system." (NW Dkt. #9, Ex. A, at 17, ¶ 5(e) & "Exhibit B.")

Clause to the paragraph dealing with service and vendor contracts, and grant Larken the unrestricted power to rent rooms in a different paragraph.

    4.   <u>Capp Was The "Clarion Hotel</u>."

In support of its decision, the Bankruptcy Court also found that "Larken signed [the HSAs] as 'the Clarion Hotel,' and not for Capp as the Hotel owner." <u>Capp</u>, 383 B.R. at 295. This finding was both factually and legally incorrect. As a matter of undisputed fact, Larken executed the HSAs as "authorized agent for" and "authorized representative" of the Hotel. (NW Dkt. #9 Ex. I, at 1, 9; Ex. J, at 1, 9.) As a matter of law, the Bankruptcy Court's finding creates yet another legal fiction. There was no separate legal entity that was the Clarion Hotel. There was only Larken as agent for Capp, owner of the Clarion Hotel. When Larken executed the HSAs on behalf of the Hotel, it bound Capp to the terms of those agreements.

Capp argued below that, because it did not personally sign the HSAs, Larken executed the contracts as agent for the Hotel and not for Capp. Capp failed to explain, however, who or what the Clarion Hotel could have been if it was not Capp. There are only three possible answers to this question. Either: (1) the Hotel was a separate legal entity; (2) Larken was the Hotel; or (3) Capp was the Hotel.

Capp admits that the Clarion Hotel was not a separate legal entity. (NW Dkt. 13, at SMF 14.) Likewise, Larken could not have been the Clarion Hotel. Capp admits that Larken was the *agent for* the Clarion Hotel, and an agent cannot be an agent for itself. To the contrary, "the existence of a principal-agent relationship assumes that each party to the relationship is a separate legal person." <u>Urban v. Am. Legion Dept. of Minn.</u>, 723 N.W.2d 1, 12 (Minn. 2006) (Hanson, J. dissenting) (citing Restatement of Agency (Second) § 1(1) (2004)); <u>accord</u> Restatement of Agency (Third) § 1.01 cmt. c (2006) ("Despite their agency relationship, a principal and an agent retain separate legal personalities."). Moreover, if Larken was the Hotel,

how could and why would Capp and Larken have entered into an agreement in which Capp engaged Larken as "the sole and exclusive managing agent" of the Hotel? And, if Larken was the Hotel, Capp could not have sold all of the Hotel's tangible and intangible assets, reservations, and room deposits to La Quinta. Likewise, if Larken was the Hotel, Capp could not have sold and assigned the contracts Larken entered into on behalf of the Hotel without a separate assignment from Larken. For all of these reasons, Larken could not have been the Clarion Hotel.

For purposes of both the Management Agreement and the HSAs, Capp was the Hotel. The Management Agreement defined the term "Hotel" to mean "[t]he hotel operated on the Property from time to time under this Agreement." (NW Dkt. #9 Ex. B, at 2.) The HSAs defined the term "Hotel" as "the Clarion Hotel." (Id. Exs. I & J, at Appx. A.) Thus, both the Management Agreement and the HSAs define the term "Hotel" similarly and identify, with respect to the Management Agreement, that specific hotel for which Larken was engaged as Capp's managing agent, and, with respect to the HSAs, that specific hotel at which Northwest was renting rooms.

Capp admits that Larken was the agent for the Hotel, that the Hotel was not a separate entity, that Larken had no property interest in the Hotel, that the Management Agreement authorized Larken to provide hotel accommodations to third parties at the Hotel, and that the terms of the HSAs require that "the party that signs for the 'Hotel' has to be authorized as agent for the Hotel." Capp owned all of the tangible and intangible assets constituting the Clarion Hotel before the HSAs were executed, while they were being performed, and even after they were prematurely terminated. Who else could the Hotel have been but Capp? And if it was not Capp, who entered into the HSAs with Northwest? The Bankruptcy Court failed to answer either of these questions. Because Capp owned the Clarion Hotel, and because the Clarion Hotel did

not exist as a separate legal entity, the Bankruptcy Court erred as a matter of law in concluding that Larken executed the HSAs as the Clarion Hotel rather than as Capp's agent for the Clarion Hotel.

     5.    <u>The Terms Of The HSAs Do Not Change Capp's Legal Status</u>.

    The Bankruptcy Court concluded that certain language in the HSAs "contemplated the hotel owner as a separate entity from the Hotel." <u>Capp</u>, 383 B.R. at 295. Specifically, the Court found that the parenthetical phrases in Paragraph 12 of the Management Agreement referring to the "Hotel owner," and the separate signature line for the "Hotel Owner" indicate that Capp was not the Clarion Hotel. But the identity of the Clarion Hotel depends on the legal relationship between Capp and Larken, not on anything a third party could have written into a contract.

    The Bankruptcy Court also misinterpreted the significance of the references in the HSAs to the Hotel owner. The HSAs do not define "Hotel" and "Owner" as separate entities. The HSAs define the "Hotel" as the "Clarion Hotel" and list the address of the building owned by Capp. There is no separate definition for "Owner." Moreover, the parenthetical phrases in Paragraph 12, by their own terms, only apply "*if the Hotel owner is not a party hereto*." It begs the question to suggest that this language somehow implies that the Hotel owner is not a party or is someone or something other than the Hotel. Likewise, nothing in the separate signature block for the hotel owner to "acknowledge[] and consent[]" requires or even implies that the Hotel owner must be, or in any given case is, distinct from the "Hotel." Instead, it provides a place for the Hotel owner to "acknowledge[] and consent[]" to the terms of the contract in certain situations where the hotel owner is not a party – <u>i.e.</u>, where the hotel is leased by the operator rather than managed on behalf of the owner and separate consent from the owner is required. There would, of course, be no need for the Hotel owner to acknowledge and consent to anything if it were already a party to the agreement.

Capp was bound to the terms of the HSAs when its managing agent for the Clarion Hotel executed them on behalf of the Clarion Hotel. A separate signature from Capp was therefore unnecessary. The parenthetical references to and signature block for the Hotel owner, by their own terms, apply only when the Hotel owner is not a party. These terms do not, and cannot, change the legal relationship between Capp, Larken, and the Clarion Hotel. Capp was the Clarion Hotel and is bound to the terms of the HSAs.

## C.    Alternatively, The HSAs Are Enforceable Through The Term Of The Management Agreement.

The Bankruptcy Court concluded that, in light of the Limitations Clause, Larken could not "bind Capp to certain types of contracts that extend beyond the period of Larken's operation of the Hotel." Capp, 383 B.R. at 294. Even if this were correct, the Bankruptcy Court erred in concluding that the HSAs could not at least be enforced through December 31, 2007—the term of the Management Agreement. Under long-standing Minnesota law, the HSAs would simply be reformed and enforced to the extent of Larken's actual authority:

> Where there is a complete execution of a power, and something ex abundantia added, which is improper, then the execution is good and only the excess is void; but where there is not a complete execution of a power, or the boundaries between the excess and the execution are not distinguishable, it will be bad.

Thomas v. Joslyn, 15 N.W. 675, 676 (Minn. 1883). The only requirement for reformation under Minnesota law is that the contract be severable. See id..

Severability is dependant upon whether a contract may be easily parsed. See Wilhelm Lubrication Co. v. Brattrud, 268 N.W. 634, 636 (Minn. 1936). The HSAs are "severable," and therefore capable of being reformed because Northwest agreed to pay a predetermined price for each room it rented on each day during the term of the HSAs. Id. ("If the part to be performed by one party consists of several distinct items, and the price to be paid by the other is apportioned to each item to be performed, or left to be implied by law, such contract will

generally be held to be severable."). The Bankruptcy Court rejected this argument based upon

certain conditions set forth in the Restatement of Agency and because it found that Northwest

had "not sought to reform the contract." <u>Capp</u>, 383 B.R. at 296 n.11. The Court erred in failing

to recognize that Minnesota has never adopted these Restatement provisions and that reformation

of a severable agency contract has never been a separate pleading requirement. Thus, at the very

least, Northwest is entitled to summary judgment on the issue of Capp's liability for the breach

of the HSAs through the duration of Larken's agency appointment.

There is little doubt that a principal can limit its agent's authority, and Capp may cite

cases where an agent is not permitted to contractually bind the principal. But those cases involve

agents authorized only to perform ministerial tasks for their principals, not managing agents

authorized to perform tasks like operating a hotel that, by their very nature, require the agent to

bind the principal. Where the agent's responsibilities require it to bind the principal, the

principal cannot be allowed to disclaim that agent's authority.

## VI.    CONCLUSION

The story of this case is apparent. Capp authorized Larken to operate its hotel, including

without limitation the rental of hotel rooms. Long-term room contracts like the HSAs were

desirable because they brought considerable and stable revenue to the Hotel, which meant

additional revenue for Capp. Capp was aware of the HSAs and their terms from at least as early

as February 2005. In August 2005, Northwest filed for bankruptcy protection with a

considerable outstanding receivable due the Hotel. Northwest's bankruptcy contributed to

Capp's decision to sell the Hotel, and after it located a buyer in early 2006, Capp had a problem

because the HSAs extended through 2009 and the buyer did not want them in the deal. It was

only then that Capp took the position that Larken lacked authority to enter the HSAs. But none

of this alters the fact that Capp was a party to the HSAs and Larken, as Capp's managing agent

for the Hotel, had actual authority to execute the HSAs on Capp's behalf.

Accordingly, the Bankruptcy Court erred in denying Northwest's motion for summary

judgment on the issue of Capp's liability for the undisputed breach of the HSAs, and this case

should remanded for a trial on Northwest's damages.


August 7, 2008

                                           s/ Brian W. Thomson
_____
                         Jeffrey A. Eyres (*pro hac vice*)
                         Brian W. Thomson (*pro hac vice*)
                         LEONARD STREET AND DEINARD
                         Professional Association
                         150 South 5th Street, Suite 2300
                         Minneapolis, Minnesota 55402
                         Telephone:  (612) 335-7090
                         Facsimile:  (612) 335-1657
                         **COUNSEL FOR APPELLANT**
                         **NORTHWEST AIRLINES, INC.**